Darlene **HOOVESTOL** and Gregory Hoovestol, Personal Representative of the Glenn Hoovestol Estate, Plaintiffs, Appellees and Cross–Appellants,

v.

**SECURITY STATE BANK OF NEW SALEM**, Defendant, Appellant and Cross–Appellee.

Civ. No. 910084.

Supreme Court of North Dakota.

Jan. 14, 1992.

---

James L. Norris, Bismarck, for plaintiffs, appellees and cross-appellants.

Wheeler Wolf, Bismarck, for defendant, appellant and cross-appellee; argued by Albert A. Wolf.

VANDE WALLE, Justice.

Security State Bank of New Salem (the Bank) has appealed from an amended district court judgment in favor of Darlene Hoovestol and Gregory Hoovestol, Personal Representative of the Glenn Hoovestol Estate (hereinafter collectively referred to as Hoovestol), and from an order denying the Bank's motion for j.n.o.v. or new trial. Hoovestol cross-appealed. We affirm.

Throughout their marriage, Glenn and Darlene Hoovestol were loan customers of the Bank. When they executed notes, Glenn and Darlene took credit life insurance provided through the Bank. When Glenn died on January 6, 1988, he and Darlene owed the Bank money on two renewal notes executed in 1987. After Glenn's death, the Bank notified Hoovestol that there was only $25,000 of credit life insurance coverage to apply to the indebtedness. After the credit life insurance proceeds of $25,000 were applied to the indebtedness, there remained a balance of $103,-044.87. Darlene made a number of payments to the Bank on the notes and paid the notes in February 1989 with funds borrowed from the New Salem Credit Union.

By complaint dated February 16, 1989, Hoovestol sued the Bank and the credit life insurance company to recover the amount of the notes Glenn and Darlene owed the Bank, plus interest thereon, less the credit life insurance paid, "as a joint and several liability of both defendants." The complaint alleged, among other things: (1) that the defendants were "estopped to deny credit life insurance coverage for the unpaid balance, plus accrued interest, on both loans ... because of their violating state law and because they breached their duty to Glenn and Darlene Hoovestol to inform them, in writing, of any credit life insurance coverage limitations before the death of Glenn Hoovestol" [1]; (2) that "defendants

---

1. The Bank and the credit life insurance company did not comply with § 26.1–37–07, N.D.C.C., which requires that credit life insurance be evidenced by an individual policy or a certificate of insurance setting forth the premium or the amount paid by the debtor for the insurance

acted unreasonably and in bad faith in withholding payment of the full amount of unpaid loan balances ... plus accrued interest"; and (3) that "defendants have breached their duty of good faith and fair dealing to plaintiffs."

By motion of February 6, 1990, Hoovestol sought permission to file an amended complaint against both defendants, alleging (1) promissory or equitable estoppel; (2) breach of implied warranty of good faith and fair dealing; (3) breach of contract; (4) negligence in failing to disclose that credit life insurance coverage was limited to $25,000; (5) deceit; (6) fraud, malice, and oppression; (7) exemplary damages; and (8) additional compensatory damages for Darlene Hoovestol's mental pain and suffering. On March 16, 1990, Hoovestol settled with the credit life insurance company for $40,000. On March 22, 1990, the trial court granted Hoovestol's motion to amend the complaint.

Trial of the action against the Bank resulted in a jury verdict awarding Hoovestol $25,000. Finding "an irregularity in the proceedings ... which prevented the plaintiffs from having a fair trial on the damages arising from the defendant's negligence", the trial court ordered a new trial. The court let stand the jury's verdict of liability for negligence against the Bank and ordered that the new trial be limited to determining if Hoovestol sustained damages as a result of the Bank's negligence and, if so, the amount of damages to be awarded.

The second trial against the Bank resulted in a jury verdict awarding Hoovestol $115,191.05, with interest at the rate of six percent per annum from January 6, 1988. Judgment was entered accordingly. After postjudgment proceedings, the trial court granted the Bank's motion to set off Hoovestol's $40,000 settlement with the credit life insurance company; reduced the interest component of the verdict, and allowed prejudgment interest only from September 13, 1990, rather than from January 6, 1988, as the jury had awarded. An amended

and a description of the coverage, including the

judgment was entered against the Bank for $76,799.76.

The Bank raised the following issues on appeal:

"*ISSUE NO. 1:* THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN GRANTING A NEW TRIAL FOLLOWING THE FIRST JURY VERDICT.

"*ISSUE NO. 2:* THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE HOOVESTOLS' CLAIMS THAT NEITHER THE DECEDENT OR DARLENE HOOVESTOL HAD ACTUAL KNOWLEDGE OF ANY CREDIT LIFE LIMITATION.

"*ISSUE NO. 3:* THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH THE DECEDENT'S ABILITY AND WILLINGNESS TO OBTAIN ADDITIONAL LIFE INSURANCE.

"*ISSUE NO. 4:* THE TRIAL COURT ABUSED IT'S [sic] DISCRETION AND ERRED IN DENYING THE BANK'S MOTION FOR JUDGMENT OF DISMISSAL NOTWITHSTANDING THE VERDICT OR IN THE ALTERNATIVE FOR A NEW TRIAL."

Hoovestol raised the following issues on cross-appeal:

"*ISSUE NO. 1:* THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN REDUCING THE INTEREST AWARDED BY THE JURY VERDICT.

"*ISSUE NO. 2:* THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN OFF SETTING THE $40,000.00 SETTLEMENT PLAINTIFFS RECEIVED FROM OMAHA FINANCIAL LIFE INSURANCE COMPANY TO REDUCE THE JURY VERDICT."

### I. *The Appeal*
#### 1. New trial

■ The Bank contends that the trial court abused its discretion in ordering a new trial after the first jury verdict. At the first trial, the trial court orally instructed the jury:

amount and term thereof.

"B. Negligence. In arriving at the amount of your verdict for damages arising from negligence, you may consider whether Glenn and Darlene Hoovestol with knowledge that credit life insurance was limited to $25,000 had the ability and inclination to secure other insurance so as to cover the debt in whole or in part. Stated differently, plaintiffs can only prove damages for negligence if they show by evidence they could and would have taken action to secure other insurance to replace that which they claim they did not receive from defendant. The measure of damages in this case for negligence is the amount which will compensate the detriment caused by the negligent act or omission."

The court also allowed the jurors to bring written copies of the instructions into the jury room. The jury returned a $25,000 verdict in favor of Hoovestol.

On October 9, 1990, the day the first trial ended, counsel for Hoovestol reported to the trial judge that on his way to lunch a juror told him "that the jury was unable to award more than $25,000 ... because the instruction said that ... the plaintiffs had to prove beyond a reasonable doubt that ... Mr. Hoovestol would have been or could have been insurable." The trial judge then went into the jury room and discovered that one set of instructions contained the instruction quoted above, except that the second sentence stated: "Stated differently, plaintiffs can only prove damages for negligence if they show by evidence *beyond a reasonable doubt* that they would have taken action to secure other insurance to replace that which they claim they did not receive from defendant." (Emphasis added.) The court told counsel for the parties:

"... I looked at the one that had 'B. Paul' on the top, that was the foreman's name, and unfortunately that one has the language in it.

"... That is language that I recall was intended when we were going over the instructions and supposed to have been deleted. I don't—the copy machine was flying copies all over the floor yesterday, and I'm afraid that something that was not supposed to be in the instructions got in there."

At an October 15, 1990, hearing on the matter of the instruction, Hoovestol presented a juror affidavit stating:

"1. The jury was concerned by the language 'beyond a reasonable doubt' in the jury instructions on negligence regarding the measure of compensatory damages.

"2. The jury may have given a different award of compensatory damages had the language 'beyond a reasonable doubt' not been in the jury instructions."

Hoovestol offered the affidavit "to prove the jury did consider the beyond a reasonable doubt language" and moved for a mistrial. The trial court told counsel:

"And the instruction that got into the jury was not supposed to be there, ..., and it was an incorrect statement of the law because it required the damages on negligence be proved by evidence beyond a reasonable doubt. In my [mind] that taints the proceedings, the jury's proceedings, with regard to their verdict on the amount of damages for negligence."

The trial court found the provision of the beyond-a-reasonable-doubt instruction "to be an irregularity in the proceedings ... which prevented the plaintiffs from having a fair trial on the damages arising from the defendant's negligence" and, pursuant to Rule 59(b)(1), N.D.R.Civ.P.,[2] ordered a new trial to determine the amount of damages, if any, to be awarded to Hoovestol.

The Bank argues that the trial court abused its discretion in considering the juror's affidavit and copies of jury instructions after the verdict, and that any irregu-

---

2. "(b) *Causes for New Trial.* The former verdict or other decision may be vacated and a new trial granted on the application of a party aggrieved for any of the following causes materially affecting the substantial rights of the party:

"1. Irregularity in the proceedings of the court, jury, or adverse party, or any order of the court or abuse of discretion by which either party was prevented from having a fair trial; ..."

larity resulting from the inclusion of erroneous language in one set of jury instructions was harmless. We disagree.

A trial court's decision to grant a new trial pursuant to Rule 59(b), N.D.R.Civ.P., "will not be disturbed on appeal absent a showing of a manifest abuse of discretion." *Okken v. Okken,* 325 N.W.2d 264, 269 (N.D.1982). "Furthermore, because ... the granting of a new trial merely results in the trial of the case to another jury, we require a strong showing that the trial court abused its discretion in granting the motion for a new trial before we will reverse the granting of the motion." *Id.*

■ Ordinarily, juror affidavits are not admissible to impeach a jury's verdict. They may be used "to show juror misconduct based upon extraneous prejudicial information, outside influence, or a chance verdict." *Andrews v. O'Hearn,* 387 N.W.2d 716, 719 (N.D.1986). Juror affidavits may not be used "to demonstrate how the jury arrived at its decision." *Id.* Under Rule 606(b), N.D.R.Ev., juror affidavits may be used to show "extraneous prejudicial information, outside influence, or a chance verdict," which may be grounds for a new trial under Rule 59, N.D.R.Civ.P. *Keyes v. Amundson,* 343 N.W.2d 78, 84 (N.D.1983); *see Kerzmann v. Rohweder,* 321 N.W.2d 84 (N.D.1982). As we observed in *Keyes,* federal courts construing Rule 606(b), F.R.Ev., from which our Rule 606(b), N.D.R.Ev., was derived, "have consistently held that jurors may testify regarding the receipt of extraneous prejudicial information by the jury or improper outside influence, but they may *not* testify to its subjective effect on the verdict or on their individual deliberations." 343 N.W.2d at 85. See also, 11 C. Wright & A. Miller, *Federal Practice & Procedure: Civil* § 2810 (1973). Once the trial court "determines from the affidavits that extraneous prejudicial information has improperly reached the jury ..., the court must apply an *objective* standard to determine its prejudicial effect." *Keyes, supra,* 343 N.W.2d

at 85. The trial court must "determine if there is a reasonable possibility that the extrinsic material could have affected the verdict, and, if so, a new trial is required." *Id.,* at 85.

■ "The trial court has wide discretion in determining whether or not to grant a new trial on the basis of jury misconduct and its determination will not be set aside on appeal unless it has abused its discretion." *State v. Abell,* 383 N.W.2d 810, 812 (N.D.1986) [where this court concluded that there was a reasonable possibility that the jury's unauthorized use of a dictionary it requested and received from the bailiff could have affected the verdict and concluded that the trial court abused its discretion in denying the defendant's request for a mistrial]. See also *Demaray v. Ridl,* 249 N.W.2d 219 (N.D.1976). *Demaray* was a wrongful death action in which a law book, 74 N.W.2d, open to a wrongful death case, had been left in the jury room after a conference between the trial judge and the attorneys. A juror affidavit indicated that the book was closed, set aside, and not referred to by the jury. The trial court found prejudicial error entitling the plaintiffs to a new trial. This court affirmed, stating:

"[W]e find, because the law book was opened to a wrongful-death case—and the present case under consideration by this jury was also a wrongful-death case—that it was wholly within the trial court's discretion to find the law book's presence in the jury room to be prejudicial error and to entitle the Demarays to a new trial, without requiring a showing that the law book was used by the jury."

*Demaray v. Ridl, supra,* 249 N.W.2d at 226.

■ In our view, an instruction containing an incorrect statement of the law setting forth a party's burden of proof,[3] that the trial court did not intend the jury to receive, but which the jury nevertheless received by accident or oversight, is "extra-

---

**3.** An instruction error on the burden of proof may be reversible error. *See, e.g., In re B.G.,*

477 N.W.2d 819 (N.D.1991).

neous prejudicial information ... improperly brought to the jury's attention" [Rule 606(b), N.D.R.Ev.], the consideration of which by the jury constitutes an "[i]rregularity in the proceedings of the ... jury" [Rule 59(b)(1), N.D.R.Civ.P.], which may be grounds for a new trial.

We conclude that the trial court did not abuse its discretion in considering the juror affidavit or in considering the copies of jury instructions found in the jury room after the jury returned its verdict. "[T]here is a reasonable possibility that the extrinsic information could have affected the verdict of a hypothetical average jury." *Keyes, supra,* 343 N.W.2d at 86. We, therefore, conclude that the trial court did not abuse its discretion in ordering a new trial because of the irregularity in the proceedings of the jury.

2. Knowledge of credit life limitation

■ The Bank contends that the evidence was insufficient to support Hoovestol's claim that neither Glenn nor Darlene had actual knowledge of any credit life insurance limitation. "In determining the sufficiency of the evidence to sustain a jury verdict, we must view the evidence in the light most favorable to the verdict." *Merrill Iron & Steel, Inc. v. Minn-Dak Seeds, Ltd.,* 334 N.W.2d 652, 656 (N.D.1983). Credibility of witnesses and the weight to be given their testimony are fact questions for the jury to determine. *Id.* If there is substantial evidence to sustain a jury verdict, we are bound by the verdict even though there is conflicting evidence. *Id.*

■ Darlene Hoovestol testified: (1) that she was never informed of any limitation on the amount of credit life insurance on their notes to the Bank; (2) that the Bank never told her the amount of credit life insurance premium she was paying when she made payments on the notes or that there were limitations on the amount of credit life insurance for which she was paying; (3) that she never received any notice from the Bank of any limitations on credit life insurance; (4) that they were not told that "credit life was limited to something less than" what they owed the Bank; (5) that nothing on the notes indicated any

limitation on the amount of credit life insurance; and (6) that "[Glenn] thought he had full credit life. I know that. We had discussed it several times and he told me he had full credit life." Viewed in the light most favorable to the verdict, there is substantial evidence to sustain the verdict.

3. Ability and willingness to obtain additional insurance

■ The Bank contends that the evidence was insufficient to establish the decedent's ability and willingness to obtain additional life insurance to cover the Hoovestols' indebtedness to the Bank. Darlene Hoovestol testified that "Glenn would not have wanted to leave me in debt" and that if the Bank had told them that there was a limitation on the amount of credit life insurance they would have purchased other life insurance sufficient to cover the indebtedness. Darlene's testimony is sufficient to establish the decedent's willingness to obtain additional life insurance to cover the indebtedness to the Bank.

Bernard Fix, a life insurance agent since 1958, testified that, in his opinion, "[i]n 1987 ... a gentleman, Mr. Hoovestol, who was 5 feet, 10 inches tall, weighed 280 pounds, and had a history of a heart murmur" would be insurable. He also testified that a person with aortic stenosis would not necessarily be uninsurable. He further testified that one whose application for life insurance was rejected by one insurance company could be insurable by another insurance company.

Kevin Olson, an assistant vice-president of the underwriting department of Provident Life Insurance Company, who had been in the underwriting department for approximately seven and one-half years, was called as a witness by the Bank. He testified that in 1987 his company would have declined an insurance application from Glenn Hoovestol until a cardiac evaluation had been performed. He testified that, because Glenn Hoovestol's physician had recommended a cardiac evaluation, "we would have found him to be uninsurable at the time until after the evaluation would have been completed." He also testified

that "just because [his] company might not accept a risk, ... doesn't mean another insurance company would not accept the risk" and that his "determination whether he may or may not be insurable may be different from another company."

Viewed in the light most favorable to the verdict, the testimony of Fix and Olson is sufficient to establish Glenn Hoovestol's ability to obtain additional life insurance to cover the Hoovestols' indebtedness to the Bank, and is sufficient to sustain the verdict.

#### 4. Denial of motion for j.n.o.v. or new trial

■■■ The Bank contends that the trial court abused its discretion and erred in denying the Bank's motion for judgment of dismissal notwithstanding the verdict or in the alternative for a new trial. "[I]n determining if judgment n.o.v. should be granted, the trial court must employ a rigorous standard with a view toward preserving verdicts." *Okken v. Okken,* 325 N.W.2d 264, 267 (N.D.1982). "The test is whether or not the evidence, when viewed in the light most favorable to the party against whom the motion is made, leads to but *one* conclusion as to the verdict about which there can be no reasonable difference of opinion." *Id.* We employ the same standard on appeal. *Id.* We have already ruled against the Bank's challenges to the sufficiency of the evidence. As we recently said in *Witthauer v. Burkhart Roentgen, Inc.,* 467 N.W.2d 439, 445 (N.D.1991): "Because of our disposition of the issues on the appeal from the judgment entered on the jury verdict, we conclude that the trial court did not abuse its discretion in denying the post-trial motions for judgment notwithstanding the verdict and, in the alternative, for a new trial."

#### II. The Cross Appeal
##### 1. Reduction of interest

■■■ Hoovestol contends that the trial court "abused its discretion and erred" in reducing the interest awarded by the jury verdict. At trial, Hoovestol introduced an exhibit summarizing the damages resulting from nonpayment of the indebtedness by

credit life insurance proceeds. The exhibit showed a principal balance of $103,044.87 remaining on the notes after reduction by the payment of $25,000 in credit life insurance proceeds. The exhibit also showed the interest that Darlene Hoovestol paid on the balance to the Bank and to the New Salem Credit Union from July 28, 1988, to September 13, 1990. With the agreement of counsel for both parties, the court advised the jury, in response to a jury question during deliberations, that it could award interest from the date of Glenn Hoovestol's death or later as it determined. The jury returned a verdict awarding Hoovestol damages of $115,191.05, which included interest Darlene paid on the principal balance of the Hoovestols' indebtedness, and interest at the rate of six percent per annum on that amount from the date of Glenn Hoovestol's death on January 6, 1988.

In post-trial proceedings, the trial court and counsel recognized that awarding prejudgment interest from the date of Glenn Hoovestol's death was troublesome. Counsel for the Bank said it "may not be correct" to award prejudgment interest to the date of death. Counsel for Hoovestol said that the Bank "is estopped to raise an issue now." The following colloquy occurred between the trial court and Hoovestol's attorney:

"THE COURT: ... not only did you get [interest] as an item of damages at whatever rate was paid to the bank, you also got six percent from January 6, '88. Now that has to be a duplication; doesn't it?

\*    \*    \*    \*    \*    \*

"MR. NORRIS: ... Now, I agree there is a timing problem here, Your Honor, and I fully expected the bank to come in with evidence which would have made an analysis of this interest to present to the jury, but they didn't do so.... But I believe to say that she is receiving double interest, that is not true, Your Honor....

"THE COURT: Let's look at the last entry on Exhibit 5, date 9–13–90 she paid $631.90 interest at the Credit Union but

under the verdict she is getting interest on that amount from January 6th, 1988, even though she didn't spend it until roughly two years later.

"MR. NORRIS: I agree, Your Honor.

"THE COURT: There is something wrong with that.

"MR. NORRIS: I believe that should have been a modification, but again the bank had the obligation to put that evidence in. The bank didn't....

"THE COURT: It is getting interest on money you haven't spent yet before it becomes an item of damages.

"MR. NORRIS: I agree with the court on that.... But I don't think there is necessarily any error in that, ...

\* \* \* \* \* \*

"THE COURT: ... There is definitely a duplication, and call it what you will, but since the jury did grant prejudgment interest at the rate of six percent per annum on the verdict form from January 6, 1988, *I feel under the law I have to grant a remittur [sic] as to that and provide that interest will only run from 9–13–90, the prejudgment interest at 6 percent.* So that reduces it some. I don't suppose it is a big amount.

"Under remittur [sic], I guess you would have your right to remit that amount or ask for a new trial. I assume it being so insignificant *I can assume you are going to take the remittur [sic] and not ask for a new trial?*

"MR. NORRIS: *That is correct, Your Honor."* (Emphasis added.)

The verdict clearly awarded excessive interest to Hoovestol. Hoovestol agreed to accept a reduction in the interest awarded in lieu of a new trial. Under the circumstances presented, the trial court did not abuse its discretion by reducing the prejudgment interest on the damage award by ordering that it run from September 13, 1990, the last date that an interest payment was shown to have been made to the Credit Union, rather than from January 6, 1988, the date of Glenn Hoovestol's death.

### 2. Offsetting $40,000 settlement

Hoovestol contends that the trial court erred and abused its discretion in offsetting the $40,000 settlement received from the credit life insurance company against the amount awarded in the jury verdict. We disagree.

"[A] party may not recover twice for the same injury simply because he has two legal theories." *Merrill Iron & Steel, Inc. v. Minn–Dak Seeds, Ltd.,* 334 N.W.2d 652, 656 (N.D.1983). In *Zimprich v. Harvestore Systems, Inc.,* 461 N.W.2d 425 (N.D.1990), one defendant asserted that it was entitled to a set-off in the amount of the plaintiff's settlement with another defendant under the provisions of Restatement (Second) of Torts § 885(3). "There were separate claims against the defendants for separate types of harm" and we determined that the appellant had not "demonstrated that it is entitled to a set-off against its liability for conversion in the amount of Zimprich's settlement" with another defendant of separate claims for separate types of harm. *Id.,* at 430. Hoovestol argues that *Zimprich*

"applies to prevent the off setting of the $40,000.00.... since the settlement with the Insurance Company was not for negligence because negligence was not yet an issue. Rather, the settlement was based upon the claims of estoppel and breach of good faith and fair dealing which are separate and distinct claims from the negligence claim against the BANK as determined by the jury."

Hoovestol's reliance on *Zimprich* is misplaced.

Hoovestol's initial complaint of February 16, 1989, contained the same allegations against both the Bank and the credit life insurance company and sought to impose joint and several liability on the defendants. By motion of February 6, 1990, Hoovestol sought permission to file an amended complaint again alleging the same claims and types of harm against both the Bank and the credit life insurance company and again seeking to impose joint and several liability on the defendants. Hoovestol settled with the credit life insurance compa-

ny on March 16, 1990, for $40,000. On March 22, 1990, the trial court granted Hoovestol's motion to amend the complaint. In our view, the fact that the settlement occurred a few days before the trial court granted Hoovestol's motion to amend the complaint is irrelevant. The initial complaint alleged the same claims and types of harm against both the Bank and the credit life insurance company. The proposed amended complaint again alleged the same claims and types of harm against both defendants. We conclude that the trial court did not err or abuse its discretion in reducing the award to Hoovestol by the amount of Hoovestol's settlement with the credit life insurance company.

Affirmed.

LEVINE, MESCHKE and HEEN, Surrogate Judge.

HEEN, Surrogate Judge, sitting in place of ERICKSTAD, C.J., disqualified.

Justice H.F. GIERKE III, a member of the Court when this case was heard, resigned effective November 20, 1991, to accept appointment to the United States Court of Military Appeals and did not participate in this decision.