Roxann MILLER, Plaintiff and Appellee,

v.

Amanda BREIDENBACH, Defendant and Appellant.

Civ. No. 940023.

Supreme Court of North Dakota.

Aug. 24, 1994.

Irvin B. Nodland, P.C. (argued), Bismarck, for plaintiff and appellee.

Zuger, Kirmis & Smith, Bismarck, for defendant and appellant, argued by Jerry W. Evenson, Bismarck.

MESCHKE, Justice.

Amanda Breidenbach appeals from denial of a new trial after a jury awarded Roxann Miller a $400,000 verdict for severe whiplash injuries from Breidenbach's car rear-ending Miller's car. We affirm.

Roxann Miller drove south on Washington Street in Bismarck. Miller stopped in the inside lane for oncoming traffic to clear before making a left turn. Behind her, sixteen-year-old Amanda Breidenbach was driving south in the left lane, as well. When Breidenbach dropped a glass of pop on the floor of her car and looked down, her car hit Miller's.

Miller's neck and back became very uncomfortable later that day, and she went to a hospital emergency room. After an examination that diagnosed neck strain, Miller was released the same day. Over the next two years, Miller was treated in turn by a chiropractor, an orthopedic specialist, and a physiatrist for neck and back pain. Miller engaged in extensive physical therapy under the supervision of a physician, who also administered a series of "trigger point" injections to relieve her pain.

Miller sued Breidenbach for her injuries. After a two-day trial, the jury agreed Breidenbach's negligence caused Miller's injuries, and awarded Miller $50,000 for past pain, discomfort, and mental anguish; $150,000 for future pain, discomfort, and anguish; and $200,000 for permanent disability, all with three percent interest. Miller got a judgment against Breidenbach for $426,878.75.

Breidenbach moved for a new trial on damages, arguing that "a juror ... improperly brought to the attention of other jurors extraneous prejudicial information" and that "the jury awarded excessive damages ... under the influence of passion or prejudice." Her motion was accompanied by the affidavit of a juror, who stated:

Prior to the trial, I was generally familiar with the coverage limits of my own automobile liability insurance policy.

During the course of jury deliberations, it was talked about and understood by members of the jury that any damage award to the plaintiff would be paid by the defendant's insurance company.

In light of the jury's understanding that insurance would cover the damage award, I volunteered to the jurors that the coverage limits of my liability policy provided for $100,000 per person and $300,000 per accident in coverage, or a total of $300,000. I suggested that because the plaintiff's attorney had asked for $400,000, it was likely the defendant's policy had a $400,000 per person coverage limit. I also explained my understanding that a person has to go to court to get the maximum amount of money under an insurance policy.

Also with Breidenbach's motion were copies of an exchange of correspondence between Miller's attorney and Breidenbach's a month before trial, each offering a settlement. Miller's attorney offered to "accept $40,000 and waive future PIP coverage with [Breidenbach's] company taking care of any subrogation rights on amounts paid out to date, or she will accept $30,000 with all subrogation rights on her PIP carrier taken care of by you and with the balance of those rights remaining open for her use in the future." Breidenbach's attorney replied: "My authority now goes to $25,000 cash with PIP coverage being left open." Breidenbach's motion also included reports by a research service on recent jury verdicts, labeled "Plaintiff Recovery Probabilities for Rear–End Collisions," and "Basic Injury Values for Claims Involving Cervical/Lumbar Strain, Cervical/Theracic [sic] Strain, Multiple Back Strains, and Aggravation of Preexisting Back Strains."

The trial court ruled that NDREv 606 barred the use of the juror's affidavit because jury discussion of automobile insurance was neither "extraneous prejudicial information," nor an "outside influence," but rather was an incompetent "statement occurring during the course of the jury's deliberations."

The court rejected the evidence about settlement negotiations, too, reasoning:

> Although this evidence is interesting for its showing of how badly [Breidenbach] and her insurance company misjudged the case, it is nevertheless excluded by [NDREv] 408 and I will not consider it as it has no relevancy.

The court ruled "that the verdict amount is neither without support in the evidence, so excessive as to appear clearly arbitrary and unjust, or such as to shock judicial conscience." The trial court refused a new trial.

Breidenbach appeals, renewing her requests for a new trial on damages. Breidenbach urges jury misconduct caused the jury to "return[ ] its verdict for $400,000 after being informed by one of its own of the likelihood of liability insurance coverage and policy limits of $400,000," and argues that the verdict was excessive, "influenced by prejudice, for $400,000 in non-economic damages for a whiplash injury." We disagree.

## I. *Invalid Verdict?*

A rule of evidence directs that

> a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon the juror or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict ... or concerning the juror's mental processes in connection therewith....

NDREv 606(b). The rule, however, does allow

> a juror [to] testify on the questions whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the verdict of the jury was arrived at by chance.

*Id.* The rule forbids use of a juror's affidavit, evidence, or testimony "concerning a matter about which the juror would be precluded from testifying." *Id.*

■ According to the Notes of the Advisory Committee on the 1972 Proposed Federal Rule of Evidence 606(b), the antecedent of NDREv 606(b), the "rule does not purport to specify the substantive grounds for setting aside verdicts for irregularity." Still, David W. Louisell & Christopher B. Mueller, *Federal Evidence*, § 286, p. 118 (1979) clarify: "As a practical matter, however, the exclusionary principle [of rule 606(b) ] imposes what amounts to limits upon the ground of permissible impeachment of jury verdicts."

Breidenbach argues that the juror's affidavit was "not presented to show how the jury reached its verdict, but to demonstrate *that* extraneous prejudicial information was improperly brought to the jury's attention" about "limits of coverage and the method one must employ to obtain coverage limits (go to court)." We conclude, however, as we did in *Andrews v. O'Hearn,* 387 N.W.2d 716, 721 (N.D.1986), that this attempt to use a juror's affidavit to show how the jury reached its verdict is precisely within the rule's prohibition against impeachment of a jury verdict for a "matter ... occurring during the course of the jury's deliberations...."

■ The rule differentiates between the effect of a source external to the jury, on the one hand, and the effect of internal jury deliberations, on the other hand, "regardless of the potential of objectively ascertaining overt acts within the internal deliberations of the jury." *Andrews,* 387 N.W.2d at 721. As Louisell & Mueller, *Federal Evidence,* § 285, p. 110, explain: "In many cases in which a juror brings to deliberations extrarecord information, the problem is to determine whether the information constitutes improper 'specific facts' rather than permissible 'general knowledge' presumably possessed by every juror."

An external influence or clearly extraneous information has prejudicially reached the jury in some of our cases. *See State v. Brooks,* 520 N.W.2d 796 (N.D.1994) (presiding juror told jury about newspaper account of prior drug conviction of drug defendant's business partner); *Hoovestol v. Security State Bank,* 479 N.W.2d 854 (N.D.1992) (deleted jury instruction mistakenly went to jury); *State v. Abell,* 383 N.W.2d 810 (N.D. 1986) (dictionary used by jury); *Keyes v. Amundson,* 343 N.W.2d 78 (N.D.1983) (jurors investigated accident scene during re-

cess); *Demaray v. Ridl,* 249 N.W.2d 219, 225–26 (N.D.1976) (law book in jury room). In each of these cases, it was something more than the general knowledge that a juror brought with him when seated on the jury; it was specific facts or information about the particular case, but not in the record, that reached the jury. That is not this case.

■ Our decisions have consistently rejected jurors' affidavits about the effect of internal deliberations. *Erickson v. Schwan,* 453 N.W.2d 765, 770 (N.D.1990) (to show jurors confused by instructions); *Andrews v. O'Hearn,* 387 N.W.2d at 718–23 (to show jury disregarded instructions on cause and relied on improper definition); *Mauch v. Manufacturers Sales & Service, Inc.,* 345 N.W.2d 338, 343 (N.D.1984) (to show jury disregarded instructions); *Kerzmann v. Rohweder,* 321 N.W.2d 84 (N.D.1982) (to show jury confusion); *Brauer v. James J. Igoe & Sons Construction, Inc.,* 186 N.W.2d 459, 474 (N.D. 1971) (to show the jury misunderstood the evidence); *Christensen v. Farmers State Bank of Richardton,* 157 N.W.2d 352, 359 (N.D.1968) (to show compromise on damages); *Grenz v. Werre,* 129 N.W.2d 681 (N.D. 1964) (to show jury did not believe defendant guilty of gross negligence but awarded damages anyway); *State v. Forrester,* 14 N.D. 335, 103 N.W. 625 (1905) (to show jurors misunderstood instructions). Unless the juror's evidence reflects an external source, our rule and precedents do not permit evidentiary use of a juror's generalizations made during jury deliberations to invalidate the verdict. As we explained thoroughly in *Andrews,* 387 N.W.2d at 718–23, strong policies protect most internal discussions of the jury from judicial scrutiny.

■ General information, even misinformation, about automobile insurance that a juror mentions in the jury room, as differentiated from specific information about the case, is an internal aspect of jury deliberations, not an external effect on the jury. *See Farmers Co-op. El. Ass'n Non–Stock, Big Springs, Neb. v. Strand,* 382 F.2d 224, 230 (8th Cir.1967) (jurors discussed likelihood of insurance coverage); *Holden v. Porter,* 405 F.2d 878 (10th Cir.1969) (juror told others that certain military personnel carried liability insurance). Therefore, we conclude that the trial court did not abuse its discretion in excluding this juror's affidavit, nor in denying a new trial for jury misconduct. The verdict is valid.

## II. *Excessive Verdict?*

Breidenbach asserts that Miller's injuries do not justify $400,000 in damages. Specifically, Breidenbach argues that Miller's impairment is "not nearly as great as Dr. Ivers' numbers suggest." According to Breidenbach, Dr. Ivers, Miller's treating physician, "doubled-up on his impairment figures" by assigning five percent for her gluteus maximus/piriformis pain and five percent for her headaches as "an extension of the cervical injury," after he assigned her an eleven percent impairment of the whole spine, to reach twenty-one percent impairment "of the whole person." Breidenbach argues that, while Dr. Ivers testified that the muscle damage was permanent, having attained maximum healing, Dr. Ivers "said nothing remotely similar [on] pain." Breidenbach insists Miller is in "control of her pain to a significant degree" since she is "more comfortable depending on what she is doing."

There are many difficulties with Breidenbach's arguments. First, it is not surprising that Miller has less pain when resting, a common way of "controlling" pain by those afflicted with muscular ailments. Breidenbach's "control" argument, however, ignores the resulting losses to Miller from inactivity—not getting things done.

■ Also, in effect, Breidenbach asks to view the evidence in the light most favorable to her. That is not our standard of review. *Roberts v. Hail Unlimited, Div. of Intern. Bus.,* 358 N.W.2d 776, 780 (N.D.1984) ("This court must, in determining the sufficiency of the evidence to support the jury's award of damages, view the evidence in a light most favorable to the verdict.").

All of the evidence about Miller's injuries, her resulting pain, and its disabling effects on her was submitted through Miller's medical experts. Dr. Robert B. Ivers, a neurologist with the Fargo Clinic Meritcare system,

testified about Millers' examination, diagnosis, and treatment history for her injuries from the collision. He testified Miller's condition was permanent, leaving "problems that she is going to experience through the rest of her life." Dr. Ivers assigned her a twenty-one percent "impairment of the whole person as a result of the injuries," with five percent impairment for her headaches, eleven percent for the myofascial syndrome of the spine, and five percent for the "particularly severe problem that she's been having in the right gluteus maximus and piriformis muscles."

Dr. Michael Martire, a physiatrist with Medcenter One who administered "trigger point" injections to Miller for her pain, testified about his examination, findings, and treatment of Miller. Breidenbach's attorney cross-examined Miller's medical witnesses, and separately offered only the deposition of his cross-examination of Dr. David Larsen, Miller's orthopedic specialist. Breidenbach offered no independent medical evidence about Miller's condition.

An array of Miller's witnesses testified about how she was affected by her injuries. Bev Cross, her high school coach, testified that Miller had been one of the top five athletes that Cross had coached during fifteen years; that Miller became a state champion in the high-jump competition and second in the long jump; and that Miller later became a specialized track-and-field coach for Bismarck High School in the jumping events. Tom Knocke, an associate director of the Bismarck YMCA, described how Miller had coached their youth gymnastics program. Kim Wilke, a friend, testified how Miller's pain had changed her and decreased her activities. Glydis Richter, a radiological technologist and friend, testified Miller had been a hardworking athlete whose injuries now meant "there are so many things that she [is] not able to do." Stella Nelson, Miller's mother, explained her daughter had been "highly motivated" and a "whirlwind of activity," but "her strong muscular body deteriorate[d]" after the injuries while "I've seen her have constant pain ... in varying degrees" for two years. Marvin Nelson, her father, reported this "very gifted athlete"

now "doesn't get the sleep she should because lot[s] of times she is up at night with pain." Mike Miller, her husband, a firefighter and an express courier, testified that his wife had gone from a "go-getter" before the injuries, to one who still "wants to do things so terrible bad and some things she just can't do" anymore. Breidenbach presented no witnesses to contradict all this testimony.

Roxann Miller testified at length about her pain and how it affected her activities, at work and at home, including her relationships with her husband and their three children: Ryan, age eight; Amy, five; and Stephanie, three. She testified about the "rigorous conditioning program[ ]" that Dr. Larsen, an orthopedic surgeon, had placed her on, and about the futility of her exercise, heat, and physical therapy treatments. Responding to criticism from Breidenbach's attorney, Miller testified that she would often miss therapy sessions because her therapist "would rather not treat me at the times I did have headaches" since "the pressure that it puts on the muscles at the base of the skull would just irritate the condition." Breidenbach offered no contradictory evidence about the degree of Miller's suffering, about its restrictive effects on her activities, or to dispute her credibility.

The trial court summarized well the reasons for denying a new trial in view of all the evidence:

> This case was unique in that [Breidenbach] had no defense to liability and only a very weak defense which attempted to minimize damages. Although [Breidenbach] did not admit liability, after hearing [her] opening statement, the attorneys were called to the bench and I inquired of [Breidenbach's] attorney if she was admitting liability. I was surprised to get a no answer. This conversation was not on the record as I only wanted to know if the jury instructions should be redrafted as it appeared that [Breidenbach's] opening statement admitted liability. In any event, there was no credible evidence from the defense to dent [Miller's] liability case....
>
> ....
>
> ... [Breidenbach's] evidence was not directed to proving a lack of injury but rath-

er directed to an attack on [Miller's] doctor's impairment rating and the lack of [Miller] following medical orders in doing exercises. Under the evidence, the jury could and obviously did accept [Miller's] doctor's expertise and testimony. Further, it was in the jury's province to accept or reject [Miller's] explanations concerning the exercises. They apparently accepted her explanation. Frankly, [Breidenbach's] evidence on damages was almost as weak as her nonexistent evidence on liability. [Breidenbach] did not even have a Rule 35 examination of [Miller]. There was no evidence to dispute that [Miller] had the injuries she claimed.

. . . .

[Miller] was a young woman of unusual athletic ability, and this injury interfered with her life's activities much more significantly than one not blessed with her abilities. A 21 percent permanent impairment to the body of [Miller] was simply worth more than it would be for the ordinary couch potato. The evidence supported such a view of the evidence and the jury's assessment of $200,000 for this impairment. This 25–year old ... has a life expectancy of 57 years. This life expectancy itself requires a larger than usual verdict. Spread over 57 years, it only amounts to a modest award per year.

The fact of injury, the resultant pain, the effect of [Miller's] relations with her family and resultant anguish resulted in an award of $50,000 for past pain, discomfort and mental anguish and $150,000 for another 57 years of pain, discomfort and mental anguish. Again, the evidence was strong and uncontradicted and the long life expectancy creates the justification for a substantial award.

The combination of very strong, perhaps overwhelming, proof of liability, of a serious and permanent injury, a 57–year life expectancy, and a plaintiff physically gifted and active beyond the average person, justifies this verdict as within the sound discretion of the jury free of passion and prejudice and not excessive in amount. "To hold otherwise would be to deny the plaintiff the right to trial by jury." *Skjonsby v. Ness,* 221 N.W.2d 70, 77.

Still, Breidenbach insists that her proffered evidence of pretrial negotiations shows the excessiveness of the verdict and is admissible "to demonstrate [that Miller's] claim was *not* worth $400,000 and that the parties approached and evaluated this case before trial with a frame of reference reflecting an appreciation of normal and customary verdicts in cases involving similar damage claims." Breidenbach argues the settlement correspondence, "in conjunction with the Jury Verdict Research material" that "include [ ] reference[s] to the plaintiff's pretrial settlement demand amount and the defendant's pretrial settlement offer amount" in "many" reports, demonstrate the excessiveness of the verdict.

All this belated, supplemental evidence does not aid Breidenbach. None of it would have been admissible at trial. *Compare* NDRCivP 59(b)(4) (causes for granting new trial include "[n]ewly discovered evidence ..., which [party] could not with reasonable diligence have discovered and produced at the trial;"). It is difficult to understand how Breidenbach thinks it becomes admissible with a motion for new trial.

■ "Evidence of ... offering ... to furnish ... a valuable consideration in ... attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove ... amount of the claim or any other claim." NDREv 408. Moreover, "[e]vidence of conduct or statements made in compromise negotiations is likewise not admissible." *Id.* See *Zimprich v. North Dakota Harvestore Systems, Inc.,* 461 N.W.2d 425, 431 (N.D.1990) ("The objective of excluding evidence of compromise is to encourage compromise of disputed claims."). While the rule "does not require exclusion if the evidence is offered for another purpose," measuring the amount of damages is not another purpose, but the very purpose prohibited by NDREv 408.

■ Whatever practical guidance negotiating attorneys may find in jury-verdict publications, those reports do not appropriately measure the potential excessiveness of a particular verdict like this one. Whether a verdict is excessive does not depend on any

outside measurement, but rather upon the quality of the evidence in the trial record. By this measure, Miller's verdict measures up.

■ The verdict is not excessive. The evidence, as a whole, supports the verdict. *Wanner v. Getter Trucking, Inc.*, 466 N.W.2d 833, 837 (N.D.1991); *Cook v. Stenslie*, 251 N.W.2d 393 (N.D.1977). We conclude that the trial court did not abuse its discretion in denying a new trial.

We affirm.

VANDE WALLE, C.J., and LEVINE, NEUMANN, and SANDSTROM, JJ., concur.