2008 ND 66

**STATE of North Dakota, Plaintiff and Appellee,**

v.

**Mevludin HIDANOVIC, Defendant and Appellant.**

No. 20070130.

Supreme Court of North Dakota.

April 17, 2008.

Mark Rainer Boening, Assistant State's Attorney, Fargo, N.D., for plaintiff and appellee.

David J. Chapman, Chapman Law Firm, Fargo, N.D., for defendant and appellant.

SANDSTROM, Justice.

[¶ 1]   Mevludin Hidanovic appeals from orders denying his motions for a new trial and from a criminal judgment entered after a jury found him guilty of engaging in a riot when armed. We hold the district court did not abuse its discretion in deciding allegations of juror misconduct would not have affected the verdict of an average hypothetical juror, the court did not abuse its discretion in denying Hidanovic's motion for a new trial on the ground of newly discovered evidence, the court did not abuse its discretion in ruling on relevancy objections during the prosecution's cross-examination of a defense witness, and the court did not err in admitting into evidence an out-of-court identification of Hidanovic from a photographic lineup. We affirm.

I

[¶ 2]   The State charged Hidanovic with engaging in a riot when armed under N.D.C.C. § 12.1–25–02(1)(c), alleging that on June 24, 2006, he was knowingly armed with a dangerous weapon, a baseball bat, and participated in a fight that involved at least five persons and created a grave danger of damage and injury to persons or property.

[¶ 3]   At trial, the State presented evidence about a "fight" on the evening of June 24, 2006, at the Red River Valley Fairgrounds in West Fargo between a "Mexican family," which consisted of three brothers in the Arpero family and their spouses or girlfriends, and "a group" of Bosnians. Witnesses to the fight estimated there were 15 to 30 people involved, and there was evidence some Bosnians were the assailants and they left the area after the fight. There was no evidence Hidanovic was detained or questioned by law enforcement on the evening of the fight. The State presented evidence that during the fight, Juan Arpero was hit in the head with a baseball bat and required 16 staples to close a scalp wound, Jose Arpero was hit in the back with a baseball bat, and Lionardo Arpero was kicked in the head and required 4 stitches to close a cut over his eye. An investigator for the Cass County Sheriff's Department, Allan Kulesa, investigated the fight and initially was unable to obtain information naming or identifying the assailants. Kulesa eventually used a photographic lineup with eleven pictures in an effort to identify participants in the fight. The Arperos were unable to name their assailants or to identify any individuals involved in the fight; however, four other witnesses to the fight, Joanna Kjono, Tecola Sparks, Brandee Haas, and Cassandra Belgarde, viewed the photographs and provided an out-of-court identification of Hidanovic as a participant in the fight. Kjono, Haas, and Belgarde were unable to identify Hidanovic as the person swinging the bat, but Sparks was "[a] hundred percent sure" Hidanovic was "participating in the riot, and swinging the bat."

[¶ 4] Hidanovic presented evidence that he is Bosnian and that he and his fiancee, Chanda Hidanovic, and their four children were at the fair on June 24 with a Bosnian friend, Nurija Beganovic, when Beganovic received a cellular telephone call about a fight at the fair grounds involving other Bosnians. Hidanovic introduced evidence that he, Chanda Hidanovic, and Beganovic proceeded to the scene of the fight, but the fight was over when they arrived. Hidanovic claimed he did not participate in the fight and did not have a baseball bat.

[¶ 5] After the jury returned a verdict finding Hidanovic guilty, the court polled the twelve jurors and each juror stated the verdict was his or her true verdict. Hidanovic moved for a new trial, claiming the evidence was insufficient to support the verdict, a juror introduced racial and ethnic bias into the jury's deliberations, the court erred in denying his motion to suppress evidence of the out-of-court photographic identification of him, and the court erred in denying his objection to the prosecutor's questions about race and ethnic background. The district court denied Hidanovic's motion for a new trial. Hidanovic thereafter filed a second motion for a new trial, alleging newly discovered evidence. The district court also denied Hidanovic's second motion for a new trial.

[¶ 6] The district court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. § 27–05–06. Hidanovic's appeal is timely under N.D.R.App.P. 4(b). This Court has jurisdiction under N.D. Const. art. VI, §§ 2 and 6, and N.D.C.C. § 29–28–06.

II

[¶ 7] Hidanovic argues he is entitled to a new trial because overt juror misconduct injected race into the jury deliberations. In his first motion for a new trial, Hidanovic submitted an affidavit of juror Becky Rettig, which he claimed supported overt juror misconduct, and which stated, in relevant part:

I told the jury that I had a personal experience with Bosnians and that they stole from my business and in the same experience lied to me regarding the theft and their conduct. Even though I had never met Mr. Hidanovic, or any of the witnesses, Mr. Hidanovic's and the witnesses' race was discussed in a negative way.

[¶ 8] After a hearing on the State's "motion to determine further proceedings" in which the State asked for permission from the court before approaching the jurors, the State submitted affidavits of the eleven other jurors stating their recollections about whether juror Rettig told the jury about her "personal experience with Bosnians and that they stole from [her] business and in the same experience lied to [her] regarding the theft and their conduct."

[¶ 9] The district court thereafter denied Hidanovic's motion for a new trial, concluding all twelve juror affidavits were inadmissible under N.D.R.Ev. 606(b). The court said Rettig's affidavit reflected "a change of heart" that went to the jury's mental or thought process during deliberations and her statements were not about extraneous matters and were general and not specific about Hidanovic. The court also decided Rettig's statements were not prejudicial, because they would not have affected the verdict of a hypothetical average juror.

[¶ 10] Hidanovic argues the district court's denial of his motion for a new trial on the ground of juror misconduct deprived him of his constitutional right to a fair trial by an impartial jury. He asserts Rettig's statements constitute overt juror misconduct that appealed to racial bias and

were not part of her or the jury's mental or thought process. He claims the district court erred in relying solely on N.D.R.Ev. 606(b) to exclude Rettig's affidavit and exercised excessive caution in protecting the jury verdict while disregarding his constitutional right to counsel, to confront witnesses and evidence, and to have a verdict by an impartial jury. He contends courts should pay special attention to racial and ethnic bias in jury deliberations and to the delicate balance between the secrecy of jury deliberations and the right to a fair trial. The State responds the district court did not abuse its discretion in deciding Rettig's affidavit went to the jury's thought process. The State asserts Rettig did not provide the jury with specific additional information about Hidanovic, but discussed her generic experiences with an ethnic group. The State argues, even if the court was incorrect in its legal analysis about extraneous information, Rettig's statements would not have affected the deliberations of a hypothetical average juror.

[¶ 11] Rule 33(b), N.D.R.Crim. P., authorizes a defendant to move for a new trial on the basis of jury misconduct and requires the motion to be supported by an affidavit. We will not reverse a district court's denial of a motion for a new trial on the grounds of juror misconduct unless the court abused its discretion. *State v. Brooks*, 520 N.W.2d 796, 798 (N.D. 1994). A district court abuses its discretion if its decision is arbitrary, capricious, or unreasonable, or it misinterprets or misapplies the law. *State v. Fehl–Haber*, 2007 ND 99, ¶ 20, 734 N.W.2d 770.

[¶ 12] In considering whether to grant a new trial on the ground of juror misconduct, a district court must decide whether there was misconduct and, if so, whether the misconduct could have affected the verdict of a hypothetical average juror. *Brooks*, 520 N.W.2d at 798 (citing *Keyes v. Amundson*, 343 N.W.2d 78, 85 (N.D.1983)). The analysis of juror misconduct under N.D.R.Crim.P. 33(b) is juxtaposed with N.D.R.Ev. 606(b), which does not specify the substantive grounds for setting aside a verdict for misconduct, *see Brooks*, at 799, but deals with jurors' competency to testify about the grounds for setting aside a verdict, and as relevant to this proceeding, provided:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon the juror or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. However, a juror may testify on the questions whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the verdict of the jury was arrived at by chance. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

N.D.R.Ev. 606(b).[1]

[¶ 13] Rule 606(b), N.D.R.Ev., generally prohibits a juror from testifying about matters or statements occurring during the course of the jury's deliberations. Under N.D.R.Ev. 606(b), however, "jurors may testify regarding the receipt

---

1. Rule 606(b), N.D.R.Ev., was amended, effective March 1, 2008, to allow jurors to also testify "whether there was a mistake in entering the verdict onto the verdict form."

of extraneous prejudicial information by the jury or improper outside influence, but they may *not* testify to its subjective effect on the verdict or on their individual deliberations." *Keyes*, 343 N.W.2d at 85. "An attempt to use juror affidavits to demonstrate how the jury arrived at its decision falls precisely within the confines of the rule prohibiting impeachment of the jury verdict." *Andrews v. O'Hearn*, 387 N.W.2d 716, 719 (N.D.1986). The purpose of N.D.R.Ev. 606(b) is to preserve the finality of verdicts, to protect the privacy and integrity of jury deliberations, and to prevent jury harassment and maintain public confidence in the jury system. *Brooks*, 520 N.W.2d at 799; *Andrews*, at 719–20. Rule 606(b), N.D.R.Ev., embodies a balance between the desire for finality and certainty on one hand and the need to achieve an acceptable level of fairness and accuracy on the other hand, and if a verdict is the result of extraneous prejudicial information or outside influence, the balance favors fairness and accuracy. *Brooks*, at 799.

[¶ 14] In *Brooks*, 520 N.W.2d at 799 (quoting *State v. Poh*, 116 Wis.2d 510, 343 N.W.2d 108, 117 (1984)), we said an underlying theory for allowing a juror to testify about extraneous prejudicial information or outside influence is that the jury's decision should be based only upon evidence and arguments presented in an adversarial context in open court:

> "When a jury considers facts in a criminal case which have not been introduced as evidence, the defendant has been deprived of the opportunity to be present when evidence is being presented, to be represented by counsel at an evidentiary proceeding during trial, to cross-examine the 'witnesses' who presented the evidence, to offer evidence in rebuttal, to request curative instructions, or to take other tactical steps,

including argument to the jury, to place the evidence in perspective for the jury."

We recognized, however, jurors must draw upon their own accumulated background knowledge and experiences, including matters of human nature, commercial affairs, and everyday life, but jurors' accumulated background knowledge and personal experiences " '[do] not include communication from one juror to another of objective extrinsic facts regarding the criminal defendant or his alleged crimes.' " (Emphasis omitted). *Brooks*, at 799–800 (quoting *United States v. Howard*, 506 F.2d 865, 867 (5th Cir.1975)).

[¶ 15] In ascertaining whether a jury has been exposed to extraneous prejudicial information or outside influence, we "do not encourage 'losing parties to interview jurors with the hope that one or more of them may have made a casual remark in the jury room concerning some facet of the case not in evidence for the purpose of obtaining a new trial because of juror misconduct.' " *Praus ex rel. Praus v. Mack*, 2001 ND 80, ¶ 57 n. 2, 626 N.W.2d 239 (quoting *Keyes*, 343 N.W.2d at 87 (VandeWalle, J., concurring specially)). If evidence of possible extraneous prejudicial information or outside influence is discovered, the proper procedure is to cease investigation to reduce the possibility of juror taint from extrajudicial pressures and to notify the district court so it can conduct appropriate questioning. *Praus*, at ¶ 57 n. 2. *See Schwartz v. Minneapolis Suburban Bus Co.*, 258 Minn. 325, 104 N.W.2d 301, 303 (1960) (outlining similar procedure for hearing on juror misconduct); *see also State v. Pederson*, 614 N.W.2d 724, 730 (Minn.2000) (discussing requirements for *Schwartz* hearing); *State v. Callender*, 297 N.W.2d 744, 746 (Minn. 1980) (discussing *Schwartz* hearing in context of claims of racial bias).

[¶ 16] If a losing party establishes the existence of extraneous prejudicial information or outside influence, the prevailing party has the burden of showing the losing party could not have been prejudiced by the information or influence under an objective standard that requires a district court to decide whether there is a reasonable possibility the verdict of a hypothetical average juror would be affected. *Brooks*, 520 N.W.2d at 801; *Keyes*, 343 N.W.2d at 85–86. In evaluating the effect of the information or the influence on a hypothetical average jury, we outlined the following criteria for consideration by a district court:

> "[The] probable effect is estimated in light of the importance of the issue to which the information or influence related, the nature of the information or influence, the strength of the admitted evidence supporting the verdict, the number of jurors exposed to the information or influence, when the jury was exposed to the information or influence, how long the jury discussed these matters during deliberations, the manner in which the court dealt with the information at trial, and any other matters which logically might have a bearing on the effect of the information or influence on the jury."

*Brooks*, at 801 (quoting 27 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure* § 6075, at 469–71 (1990)).

[¶ 17] In *Brooks*, 520 N.W.2d at 798, the defendant was charged with delivery of a controlled substance, and during jury deliberations, the presiding juror, a practicing attorney, told the other jurors the defendant's business partner had been tried and convicted of a drug offense. We identified two commonly used standards for assessing the boundaries of impermissible extraneous information and permissible background information by (1) distinguishing between general information and specific facts, and (2) balancing finality on one hand and fairness and accuracy on the other hand. *Id.* at 800. In the context of a hearing on the defendant's post-trial motion for a new trial on the ground of juror misconduct, we concluded the statement about the defendant's business partner's conviction was admissible extraneous information in that proceeding under either standard. *Id.* We further concluded the State failed to show the verdict of a hypothetical average criminal jury would have been unaffected by the extraneous information. *Id.* at 801–02.

[¶ 18] In *Miller v. Breidenbach*, 520 N.W.2d 869, 870 (N.D.1994), we considered the effect of a juror affidavit stating the juror had volunteered information during deliberations about the coverage limits of that juror's automobile liability insurance policy and had suggested the defendant's policy "likely" had a $400,000 per person coverage limit because the plaintiff's attorney had asked the jury for damages of $400,000. We concluded the juror's statements about coverage limits and the procedure for recovering coverage limits were inadmissible under N.D.R.Ev. 606(b), because they involved " 'matter[s] … occurring during the course of the jury's deliberations,' " rather than extraneous prejudicial information. *Miller*, at 871 (quoting *Andrews*, 387 N.W.2d at 721). We said N.D.R.Ev. 606(b) differentiated between the effect of a source external to the jury and the effect of internal jury deliberations, and the analysis of a juror's extrarecord information focused on whether the information constituted improper "specific facts" or permissible "general knowledge" presumably possessed by every juror:

> An external influence or clearly extraneous information has prejudicially

reached the jury in some of our cases. *See State v. Brooks,* 520 N.W.2d 796 (N.D.1994) (presiding juror told jury about newspaper account of prior drug conviction of drug defendant's business partner); *Hoovestol v. Security State Bank,* 479 N.W.2d 854 (N.D.1992) (deleted jury instruction mistakenly went to jury); *State v. Abell,* 383 N.W.2d 810 (N.D.1986) (dictionary used by jury); *Keyes v. Amundson,* 343 N.W.2d 78 (N.D.1983) (jurors investigated accident scene during recess); *Demaray v. Ridl,* 249 N.W.2d 219, 225–26 (N.D.1976) (law book in jury room). In each of these cases, it was something more than the general knowledge that a juror brought with him when seated on the jury; it was specific facts or information about the particular case, but not in the record, that reached the jury. That is not this case.

Our decisions have consistently rejected jurors' affidavits about the effect of internal deliberations. *Erickson v. Schwan,* 453 N.W.2d 765, 770 (N.D.1990) (to show jurors confused by instructions); *Andrews v. O'Hearn,* 387 N.W.2d at 718–23 (to show jury disregarded instructions on cause and relied on improper definition); *Mauch v. Manufacturers Sales & Service, Inc.,* 345 N.W.2d 338, 343 (N.D.1984) (to show jury disregarded instructions); *Kerzmann v. Rohweder,* 321 N.W.2d 84 (N.D.1982) (to show jury confusion); *Brauer v. James J. Igoe & Sons Construction, Inc.,* 186 N.W.2d 459, 474 (N.D.1971) (to show the jury misunderstood the evidence); *Christensen v. Farmers State Bank of Richardton,* 157 N.W.2d 352, 359 (N.D. 1968) (to show compromise on damages); *Grenz v. Werre,* 129 N.W.2d 681 (N.D. 1964) (to show jury did not believe defendant guilty of gross negligence but awarded damages anyway); *State v. Forrester,* 14 N.D. 335, 103 N.W. 625

(1905) (to show jurors misunderstood instructions). Unless the juror's evidence reflects an external source, our rule and precedents do not permit evidentiary use of a juror's generalizations made during jury deliberations to invalidate the verdict. As we explained thoroughly in *Andrews,* 387 N.W.2d at 718–23, strong policies protect most internal discussions of the jury from judicial scrutiny.

*Miller,* at 871–72.

[¶ 19] In *Keyes,* 343 N.W.2d at 85, this Court considered an issue about jurors' unauthorized views of an accident scene, and we said parts of jurors' affidavits establishing the unauthorized views of the scene were admissible to show juror misconduct under N.D.R.Ev. 606(b), but statements about the effects of the views on the jury's deliberations were not admissible regardless of whether those statements would support or negate a conclusion of actual prejudice. This Court concluded there was a reasonable probability the circumstances of the jurors' unauthorized views of the accident scene could have affected the verdict of a hypothetical average jury. *Keyes,* at 86–87. *See Praus,* 2001 ND 80, ¶¶ 51–57, 626 N.W.2d 239 (distinguishing *Keyes* and holding circumstances of jurors' views of accident scene, a heavily traveled intersection in Grand Forks, supported district court's decision there was no reasonable possibility that extrinsic information affected jury's verdict).

[¶ 20] In *Andrews,* 387 N.W.2d at 718–23, this Court rejected a due process challenge to N.D.R.Ev. 606(b) in which the district court refused to consider six jurors' affidavits that the plaintiffs claimed established the jurors had disregarded the court's instruction on proximate cause and had relied upon their own improper definition. This Court adhered to the important

public policy of N.D.R.Ev. 606(b), to prevent examination of the mental processes of jury deliberations:

"It would greatly tend to unsettle verdicts if a juror be permitted to say, after it is too late to be remedied, that he did not understand the charge of the court. *To do so would result in continual embarrassment and interminable controversy* after trials, although a verdict had been duly and solemnly announced. *It would subject jurors to constant annoyance by being called upon to state the occurrences of the jury room, which ought to be kept secret as well as privileged.* It would subject jurors to influences by corrupt parties in an effort to have them impair their verdict after they had ceased to act as jurors. *Although injustice may at times result* from thus holding verdicts solemnly rendered unassailable by affidavits of jurors as to their not understanding the charge or as to their reasons for agreements, *we deem it the better rule, and subject to less liability to injustice, that a verdict actually rendered shall be conclusively deemed to be a verdict, and beyond impeachment* by the declaration of a juror as to a mental condition existing when he agreed upon a verdict, or as to his reasons for so agreeing." [Emphasis added.]

*Andrews*, at 719 (quoting *State v. Forrester*, 14 N.D. 335, 338, 103 N.W. 625, 626 (1905)). This Court rejected the plaintiffs' argument that the jury's agreement to disregard instructions was an objectively verifiable overt act subject to judicial review. *Andrews*, at 720–22. Rather, we relied on the strong public policy precluding consideration of internal aspects of a jury's deliberations. *Id.* at 722. We nevertheless recognized our interpretation of N.D.R.Ev. 606(b) did not mean our legal system was incapable of correcting an injustice caused by internal jury misconduct, because our procedural rules provided a mechanism for attacking a jury verdict if it was not supported by the evidence. *Andrews*, at 722.

[¶ 21] The foregoing authorities demonstrate that our decisions have consistently extolled a strong public policy that precludes examination of the internal discussions and mental processes of jury deliberations. *See also State v. Clark*, 1997 ND 199, ¶¶ 6–9, 570 N.W.2d 195 (refusing to consider juror affidavit stating jurors "bartered" their true beliefs "to assure conviction for something"); *City of Bismarck v. Bauer*, 409 N.W.2d 90, 93–94 (N.D.1987) (refusing to consider juror affidavit stating juror agreed to guilty verdict because juror was mentally exhausted after receiving verbal abuse and criticism from other jurors). Although our decisions provide a basic framework for analyzing juror misconduct, we have not considered the applicability of N.D.R.Ev. 606(b) to juror affidavits involving allegations of racial and ethnic bias during juror deliberations.

[¶ 22] Under rules similar to N.D.R.Ev. 606(b), courts and commentators have recognized difficulties with juror allegations of racial or ethnic bias during jury deliberations. *See* 27 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure* § 6074, at 504–515 (2007) (recognizing difficulty regarding evidence of jury bias); 3 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 6:17, at 91–93 (3rd ed.2007) (verdicts tainted by serious prejudices along racial, ethnic, or gender lines are problematic); 3 *Weinstein's Federal Evidence* § 606.04[5][a] (2nd ed.2007) (stating juror bias presents special difficulties). Some courts construe the broad language of rules similar to N.D.R.Ev. 606(b) to exclude all juror testimony regarding racial bias during deliberations at least to the extent the testimony might reveal the

influence of racial bias on the jury's thought process and deliberations. *See Shillcutt v. Gagnon,* 827 F.2d 1155, 1156–59 (7th Cir.1987) (holding inadmissible under F.R.Ev. 606(b) juror affidavit alleging another juror stated during deliberations, "Let's be logical; he's a black and he sees a seventeen year old white girl—I know the type"); *Martinez v. Food City, Inc.,* 658 F.2d 369, 372–73 (5th Cir.1981) (holding inadmissible under F.R.Ev. 606(b) juror affidavit that another juror said party "should be taught a lesson" for hiring Mexican nationals holding green cards); *Smith v. Brewer,* 444 F.Supp. 482, 488–90 (S.D.Iowa 1978) *aff'd* 577 F.2d 466 (8th Cir.1978) (holding inadmissible juror's testimony that during deliberations for black defendant, all-white jury heard other jurors describe defendant's black attorney's "antics" and "strutting away such as a minstrel used to do and mimics, used the black dialect to repeat some of the things [the defendant's black trial attorney] said"). *See generally* 27 Wright & Gold, *supra,* § 6074, at 505; 3 Mueller & Kirkpatrick, *supra,* § 6:17, at 91–92. Some courts, however, "faced with the difficult issue of whether to consider evidence that a criminal defendant was prejudiced by racial bias in the jury room have hesitated to apply [Rule 606(b)] dogmatically." *Wright v. United States,* 559 F.Supp. 1139, 1151 (E.D.N.Y.1983).

[¶ 23] Under an evidence rule that prohibited jurors from testifying about any matter that inheres in the verdict, Florida courts have held that jurors' statements about racial or ethnic prejudice during jury deliberations constitute overt juror misconduct. *Marshall v. State,* 854 So.2d 1235, 1239–44 (Fla.2003) (holding affidavit alleging racial bias and "racial jokes" about defendant made openly among jurors during deliberations constitutes overt acts of juror misconduct and remanding for evidentiary hearing on juror miscon-duct claim); *Powell v. Allstate Ins. Co.,* 652 So.2d 354, 357–58 (Fla.1995) (holding affidavit alleging racial jokes and racial statements by all-white jury about plaintiffs, black citizens of Jamaican birth, throughout trial proceedings and during jury deliberations constitutes sufficient overt acts of juror misconduct and remanding for appropriate hearing to ascertain whether racial statements were made and, if so, ordering new trial). In *Marshall,* at 1241 (quoting *Powell,* at 357–58) the Florida Supreme Court said it was improper to inquire into the thought processes of individual jurors to discover bias, but when appeals to racial bias are made openly among the jurors, those statements constitute overt acts of misconduct under a "bright line" that prevents bias from being expressed so as to overtly influence others.

[¶ 24] Other courts and commentators have also recognized that evidence of racial and ethnic bias may sometimes justify considering juror testimony that would otherwise be inadmissible under a rule similar to N.D.R.Ev. 606(b). *United States v. Henley,* 238 F.3d 1111, 1121 (9th Cir.2001) (finding "persuasive those cases that have exempted evidence of racial prejudice from Rule 606(b)'s juror incompetency doctrine," but declining to decide whether the rule prohibits juror testimony about racial statements during deliberations because evidence established juror had lied during voir dire); *Shillcutt,* 827 F.2d at 1159 (stating rule of juror incompetency cannot be applied in such an unfair manner as to deny due process, but holding there was not substantial probability alleged racial slur made difference in outcome of trial); *Tobias v. Smith,* 468 F.Supp. 1287, 1289–91 (W.D.N.Y.1979) (stating Sixth Amendment guarantee of a fair trial injects constitutional element into evidentiary question and remanding for evidentiary hearing whether jurors said

issue of identification did not matter because "you can't tell one black from another" and jury should take word of white victim as opposed to black defendant); *Brewer*, 444 F.Supp. at 490 (stating Rule 606(b) should not be applied dogmatically to ignore evidence of racial bias that may offend fundamental fairness and holding juror's conduct in mimicking defendant's black attorney's antics did not prejudice defendant); *State v. Santiago*, 245 Conn. 301, 715 A.2d 1, 14–22 (1998) (inquiring into allegations juror referred to Hispanic defendant as a "spic" during jury deliberations and deciding allegations not credible); *Fisher v. State*, 690 A.2d 917, 920 n. 4 (Del.1996) (stating Rule 606(b) does not preclude admissibility of juror statement during deliberations that "any black guy who would be in an area at that time with this, he's guilty" because evidentiary rules that insulate from discovery the violation of constitutional rights may violate right to fair and impartial jury); *Callender*, 297 N.W.2d at 746 (stating Rule 606(b) does not preclude inquiry into jury deliberations where there is strong evidence racial prejudice infected jury's verdict, but holding evidentiary hearing not necessary because there was not substantial evidence to support claim juror had used racial epithet during deliberations); *State v. Watkins*, 526 N.W.2d 638, 640–41 (Minn.Ct. App.1995) (reversing and remanding for new trial where juror affidavit stated bailiff had referred to defendant's attorney as "darky" or "that darky" and other jurors referred to defendant as "darky" or "that darky" during deliberations); *State v. Johnson*, 2001 SD 80, ¶¶ 12–13, 630 N.W.2d 79 (reversing and remanding for new trial in rape prosecution of African–American where jurors stated "I've got a rope" and "I have a tree").

[¶ 25] Courts have universally held that provisions similar to N.D.R.Ev. 606(b) also do not preclude evidence to show a juror lied during voir dire. *McDonough Power Equip. v. Greenwood*, 464 U.S. 548, 556, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984) (holding party may be entitled to new trial if juror failed to honestly answer a material question during voir dire and if a correct response would have provided a valid basis for challenge for cause); *Henley*, 238 F.3d at 1121 (remanding for specific findings about alleged statements where juror asked direct questions about racial bias during voir dire and swore racial bias would play no part in deliberations, evidence of juror's alleged racial bias admissible to determine whether juror's responses during voir dire were truthful and may warrant new trial); *Hard v. Burlington N.R.R.*, 812 F.2d 482, 485 (9th Cir.1987) (holding statements that show deceit during voir dire are not barred by Rule 606(b)). Our cases have also recognized that voir dire is an appropriate time to discover juror bias. *See Brooks*, 520 N.W.2d at 802 (Meschke, J., concurring).

[¶ 26] A criminal defendant has a state and federal constitutional right to a fair trial by an impartial jury. *State v. Newman*, 2007 ND 148, ¶ 6, 738 N.W.2d 887. We agree with the foregoing authorities that racial and ethnic bias cannot be condoned in any form and may deprive a criminal defendant of a right to a fair trial by an impartial jury. Here, assuming the allegations of juror Rettig's statements during jury deliberations ordinarily would have warranted an inquiry by the district court regarding whether Rettig factually made those statements, *see Praus*, 2001 ND 80, ¶ 57 n. 2, 626 N.W.2d 239, we conclude the district court did not abuse its discretion in deciding her statements would not have affected the verdict of a hypothetical average jury. *See Brooks*, 520 N.W.2d at 798; *Keyes*, 343 N.W.2d at 85–86.

**[¶ 27]** In deciding Rettig's statements would not have affected the verdict of a hypothetical average jury, the court quoted the criteria cited in *Brooks*, 520 N.W.2d at 801, for evaluating the effect of extraneous information or outside influence on a hypothetical average jury and said:

> In regards to this matter, the statements that [Rettig] gave were, again, of general nature of her own personal experiences and life experiences, whether reprehensible or not, that she brought to a jury room. They did not specifically relate to Mr. Hidanovic. They did not specifically relate to Roma Bosnians, although I'm not so sure that the jury or otherwise could be expected to define as such. Although that was greatly discussed at the jury trial in regards to this matter, and maybe that's one of the reasons why the State went down that road, I don't know.

> But a general jury, even assuming that her statements are true in part or otherwise, this was something that was brought up, a general nature, and I do not believe, quite frankly, that this type of—if extraneous, admissible evidence—which is brought to a jury of twelve citizens of average, ordinary intelligence in the State of North Dakota would consider for more than a couple minutes, quite frankly, if at all. I guess, maybe I have more faith in the citizens of the State of North Dakota, [than] to believe that an objectively, a hypothetical average jury would buy into such types of misstatements of prejudice, race or otherwise.

> So, the Court doesn't buy into it. If it was brought up, it was brought up for a short period of time, and several individuals indicate it was brought up, if you want to be subjective about it. But it was brought up for a short period of time, it has nothing to do directly related to the charge of Engaging in a Riot When Armed.

> If even believed, the general information or misinformation that the juror's affidavit conveys to the jury for a short period of time, has nothing to do with Mr. Hidanovic, nothing to do with his family members, nothing to do with anyone who testified other than for base ethnicity or race or prejudice reasons, and I do believe, and I feel comfortable in saying, that a hypothetical average jury in the State of North Dakota would not be affected by that type of a general statement, non-specific to the Defendant.

> And even if they were to believe that statement, for example, you would have to make several leaps of logic to have that prejudice and affect the Defendant. Meaning that, for example, if you believe that, she says that a Bosnian or Bosnians were terminated from her business that she shared with her husband because they had lied. Mr. Hidanovic is not charged with lying, okay, certainly he testified so it could be a credibility issue, so that's definitely true, but if you're an objective jury you have to make leaps of logic that—okay, so Ms. Rettig or a juror believes in general Bosnians are not truthful.

> If you assume Mr. Hidanovic's a Bosnian because he does carry a Bosnian passport, that is his nationality, in regards to this matter. You would have to then assume a hypothetical average jury would believe that Bosnians are not telling the truth as a whole, which I don't believe they would. You then would have to somehow relate that to this case where he's not charged with lying, he's not charged with forgery, he's not charged with theft, he's not charged with any sort of a property crime like that. He's actually charged with En-

gaging in a Riot While Armed, so it would be a credibility issue as opposed to anything having to do, for example, in *Brooks* where extraneous prejudicial information was given in regards to that matter, specific to that particular crime, specific to the business partner of the Defendant. That is inappropriate, that demands a new trial.

This type of general statements, whether one or more of them are admissible pursuant to the affidavit, were not prejudicial to a hypothetical jury. If you take it a step farther and say rather than objectively looking at a hypothetical jury, which I believe is the test, if you look at those factors cited by the Supreme Court, some of them appear to be subjective. If you look at the matter subjectively, weigh the affidavits, balance the reasoning, rationale, credibility of the affidavits in light of the jury selection process, which the Court has reviewed, the Court finds that the affidavits would weigh in favor of the fact that if that information was stated subjectively to this jury, that that information was discarded by these jurors.

That they made the decision, as they indicated in their affidavits, based upon the law, tried to follow the law the best they could, and the like, and subjectively, if that is the test which I believe it is not the test for the second part under *Brooks,* using some of those factors, it was only discussed for a short period of time, not particularity [sic] relevant. It was prejudiced, but would not be prejudicial to the Defendant of a hypothetical average jury even if you look at it subjectively with the evidence that's presented.

[¶ 28] The district court had the opportunity to observe the entire trial proceedings, and the court instructed the jury to decide the case on evidence received during trial and not from any other source. The court also instructed the jury it must be fair and impartial, it must treat everyone equal under the law, it "should not be prejudiced against or biased for a person for such reasons as race, gender, religion, political views, social views, wealth, or poverty," and its decision must not be influenced by sympathy or emotion. A jury is generally presumed to follow instructions. *State v. Hernandez,* 2005 ND 214, ¶ 24, 707 N.W.2d 449. On this record, we cannot say the court's decision about the effect of the alleged juror misconduct was arbitrary, capricious, or unreasonable, or a misapplication of the law. Moreover, we also observe that Rettig's statements were the type that ordinarily would be discoverable during voir dire, and if she had been untruthful during voir dire, Hidanovic may have been entitled to a new trial under the rationale of *McDonough Power Equip.,* 464 U.S. at 556, 104 S.Ct. 845, if a truthful response would have provided a valid basis for a challenge for cause. This record does not reflect that juror Rettig was asked questions about racial or ethnic bias during voir dire. Careful questioning during voir dire helps preserve the balance of the policies of finality and certainty with a fair and accurate result while also providing a method to handle jurors who are not honest during voir dire or may have second thoughts about a verdict. On this record, we conclude the district court did not abuse its discretion in denying Hidanovic's motion for a new trial on the ground of juror misconduct.

### III

[¶ 29] Hidanovic asserts the district court erred in not granting him a new trial based on newly discovered evidence that a witness to the fight, Ashley Kron, did not see Hidanovic participate in the fight or use a baseball bat. He asserts that although this witness was mentioned

at trial, her testimony about her observations was not discovered until after trial. He claims he exercised due diligence and the new evidence was not merely cumulative or impeaching, but was material and was sufficiently strong to have probably resulted in an acquittal.

[¶ 30] In *State v. Driscoll*, 2005 ND 105, ¶ 23, 697 N.W.2d 351 (quoting *State v. Steinbach*, 1998 ND 18, ¶ 22, 575 N.W.2d 193) we outlined our standard for a motion for a new trial based on newly discovered evidence:

> To prevail on a motion for a new trial on the ground of newly discovered evidence, the defendant must show (1) the evidence was discovered after trial, (2) the failure to learn about the evidence at the time of trial was not the result of the defendant's lack of diligence, (3) the newly discovered evidence is material to the issues at trial, and (4) the weight and quality of the newly discovered evidence would likely result in an acquittal. A motion for new trial based upon newly discovered evidence rests within the discretion of the trial court, and we will not reverse the court's denial of the motion unless the court has abused its discretion. If the newly discovered evidence is of such a nature that it is not likely to be believed by the jury or to change the results of the original trial, the court's denial of the new trial motion is not an abuse of discretion.

[¶ 31] In denying Hidanovic's motion for a new trial on this issue, the district court decided Kron had been mentioned at trial and was not unknown, and her proposed testimony was relevant, but was cumulative and would not have resulted in an acquittal. The record reflects Ashley Kron was the girlfriend of one of the victims, Lionardo Arpero. There was testimony at trial that the Arpero brothers were at the fair with their wives and girl-

friends. We conclude the district court did not abuse its discretion in deciding Kron's testimony was not unknown and Hidanovic's failure to learn about the evidence at the time of trial was the result of his lack of diligence. We conclude the district court did not abuse its discretion in denying Hidanovic's motion for a new trial on the ground of newly discovered evidence.

## IV

[¶ 32] Hidanovic argues he is entitled to a new trial because the prosecutor continuously injected ethnicity into the cross-examination of a defense witness, Nurija Berganovic. Hidanovic asserts the prosecutor labeled Berganovic and Hidanovic as "gypsies" and also as "zigeuner," which Hidanovic claims is a "bad word" in German. He asserts the prosecutor wanted the jury to believe they were "zigeuner" and therefore bad persons.

[¶ 33] During Hidanovic's direct examination of Berganovic, the following colloquy occurred:

Q   Okay, and do you in fact know Mr. Hidanovic?

A Yeah, yes I do.

Q   Okay, and how do you know him?

A I know him back—even back from Bosnia, and then we know each other from Germany, and then we know each other from here, so.

Q   You said you knew him back in Bosnia, is the Bosnian community here in Fargo pretty tight knit?

A Yeah.

Q   And is that because a lot of them knew each other back in Bosnia?

A Yeah, back—yeah.

Q   Okay, so in a way it's almost a transplanted community?

A Yes, it is, basically behind twenty years, probably fifteen years from a lot other cultures, you know.

[¶ 34] During the prosecutor's cross-examination of Berganovic, the following colloquy occurred:

Q Sir, you've been referring to the Bosnian community here in the Fargo Moorhead area, is that correct?

A Yes.

Q Is there a difference between the Bosnian community and the Roma Bosnian community?

A Yes.

Q Which community are you a member of?

A We don't have—we don't have no communities, you know like community house or whatever. I'm actually both, it's—we're more the gypsies, the Roma, like you said. We're more together than the Bosnian people are.

Q Okay, and so you say you're both, you lived in Bosnia, is that correct?

A Yeah.

Q But you're a member of the Roma community, or as you put it, the gypsy community in Bosnia, is that correct?

A Yes.

Q And so you've lived both in Bosnia with the Defendant, you've lived in Germany with the Defendant?

A Yes.

Q And now you're living in the United States with the Defendant, is that correct?

A Yes.

Q So you've known him since he was how old?

A Since I was old, because he's older than me, I'm twenty-four years old, I'll be twenty-five, so.

Q And how long have you know him?

A I guess twenty-four.

Q So you've known him since you were an infant, your whole life?

A Yeah, I've been knowing him my whole life.

Q Okay.

A As far as I remember myself, I remember him.

Q And as you've described it, the Roma community is very tight, is that right?

A Yes.

Q And so everybody has their cell phones set up that only one person needs to call and everybody gets notice if something's happening, correct?

A I don't know how you want to put that together, but you know if somebody calls, let's say if somebody calls me, hey I'm in trouble, I'm fighting with somebody. You know, if I can help, I'll be there.

Q And that would go for the whole Roma community, correct?

A No, no. I mean not everybody likes everybody, you know. You know, not everybody, you know, doesn't matter how many gypsy people or Romanian people are there, somehow they're not related or somehow they fight back home or they don't like each other, you know.

Q Sir, if you lived in Germany, you're aware that in German, gypsies are referred to as Zigeuner, correct?

A Yes.

[DEFENSE COUNSEL]: Objection, relevance.

MR. BOENING: I would like—

THE COURT: I'll overrule the objection, you may proceed Mr. Boening. You can renew your objection, see where we're going with this. Mr. Boening.

Q (BY MR. BOENING) Sir, would you prefer that someone like me here in American refer to you as Roma or gypsy, or doesn't it matter?

A To me—a lot of people don't like it—to call them gypsy, but I am a gypsy, so I'm not ashamed of it, and I don't care how you call me.

Q Zigeuner—

A As long as you don't hit me.

Q Zigeuner's a bad word in German, right?

[DEFENSE COUNSEL]: Objection again, Your Honor.

A NO.

[DEFENSE COUNSEL]: I don't see the relevance in his questioning.

THE COURT: Objection overruled. You can answer the question, sir.

A I can answer?

THE COURT: Yup, you may.

A No, it's not. It depends how you feel. It depends how you feel about yourself.

[¶ 35] In ruling on the relevancy of evidence under N.D.R.Ev. 403, a district court has broad discretion to balance the probative value of the evidence against the risk of unfair prejudice, and we review the court's decision under the abuse of discretion standard. *State v. Bell*, 2002 ND 130, ¶ 14, 649 N.W.2d 243. Moreover, a district court is vested with discretion to decide whether a party has opened the door for the admission of further evidence about a subject. *Hernandez*, 2005 ND 214, ¶ 21, 707 N.W.2d 449.

[¶ 36] In denying Hidanovic's motion for a new trial based on alleged improper prosecutorial conduct, the district court explained:

This is direct examination by defense counsel ... not by the State of North Dakota. In that, defense counsel inquired of Mr. Beganovic, "You said you knew him back in Bosnia, is the Bosnian community here in Fargo pretty tight knit?" And the answer is "yeah", or in the affirmative, that's for example, on page 143. Defense counsel brought that issue at hand, which there's nothing improper about ... doing that by the way, but that certainly on direct testimony is reasonable then for Mr. Boening on behalf of the State of North Dakota to inquire about the nature of the relationship or that community on cross examination.

And so, for example, on page 156, that's inquired upon as well. On page 158–157 and 158, what we have here folks, is we have a discussion about this, there's an objection, an overruling of the objection, allowance for the answers, including that Mr. Beganovic stated more than once on the record that he was not offended by the questions, that he was okay being referred in that way.

Consistent with the context in which the questions were asked by Mr. Boening, consistent with the nature of this trial and the arguments, opening arguments, closing arguments and the like, of the nature of the manner and why this crime was allegedly occurred as alleged by the State of North Dakota at that time, there is nothing improper about Mr. Boening's questions in regards to this matter.

[¶ 37] Under our standards for relevancy and for opening the door for further testimony about a subject, we conclude the district court did not abuse its discretion in denying Hidanovic's relevance objections during trial and did not abuse its discretion in denying Hidanovic's motion for a new trial on this issue.

## V

[¶ 38] Hidanovic argues the district court erred in not suppressing an out-of-court identification of him from a photographic lineup. He argues there was no physical evidence linking him to the fight,

and the photographic identification, which occurred six days after the fight, was the only means by which he was identified as being armed with a bat at the fight. He claims the identification was highly suspect and too tenuous to allow the photographic lineup to be admitted into evidence or to serve as a basis for an in-court identification. The State responds the photographic identification procedure was not unduly suggestive.

[¶ 39] In denying Hidanovic's suppression motion after an evidentiary hearing during trial, the district court said the photographic array was a multiple array of between ten to eleven photographs and the defendant failed to show the identification procedure was suggestive. The court also found, even if the procedure was suggestive, the identification was reliable.

[¶ 40] A district court's decision on a motion to suppress will not be reversed if, after conflicts in the testimony are resolved in favor of affirmance, there is sufficient competent evidence fairly capable of supporting the court's findings, and the decision is not contrary to the manifest weight of the evidence. *State v. Norrid*, 2000 ND 112, ¶ 5, 611 N.W.2d 866 (quoting *State v. Sabinash*, 1998 ND 32, ¶ 8, 574 N.W.2d 827).

[¶ 41] A determination of the admissibility of an out-of-court photographic identification involves a two-step inquiry to determine: (1) whether the photographic identification procedure was suggestive, and (2) whether the identification was, under the totality of the circumstances, reliable and thus admissible. *Norrid*, 2000 ND 112, ¶¶ 9–10, 611 N.W.2d 866; *State v. Syvertson*, 1999 ND 137, ¶ 26, 597 N.W.2d 644. The defendant has the initial burden of showing the identification procedure was suggestive. *Syvertson*, at ¶ 26. We have recognized that multiple photographs are preferred and single person identifications should be avoided. *Norrid*, at ¶ 16; *Syvertson*, at ¶ 27.

[¶ 42] Here, there were eleven photographs in the array that led to the identification of Hidanovic. Giving deference to the district court's opportunity to assess the credibility of the witnesses, we conclude the court's finding that the identification procedure in this case was not unnecessarily or impermissibly suggestive is not contrary to the manifest weight of the evidence. We hold the court did not err in denying Hidanovic's motion to suppress the photographic identification and did not abuse its discretion in denying his motion for a new trial on this issue.

VI

[¶ 43] Hidanovic argues there was insufficient evidence to support his conviction. He claims Sparks, the only eyewitness that identified him as a participant in the fight and in possession of a baseball bat, was highly unreliable, and there was insufficient evidence to show he participated in the fight and used the baseball bat.

[¶ 44] "This Court will reverse a conviction on the ground of insufficient evidence only if, after viewing the evidence and all reasonable inferences in the light most favorable to the verdict, no rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Muhle*, 2007 ND 131, ¶ 32, 737 N.W.2d 636 (quoting *State v. Steen*, 2000 ND 152, ¶ 17, 615 N.W.2d 555). In considering sufficiency of the evidence claims, we do not reweigh conflicting evidence or judge the credibility of witnesses. *State v. Frohlich*, 2007 ND 45, ¶ 27, 729 N.W.2d 148.

[¶ 45] Section 12.1–25–02(1)(c), N.D.C.C., provides that a person is guilty of a class C felony if the person while

engaging in a riot is knowingly armed with a firearm, dangerous weapon, or destructive device. "Riot" means "a public disturbance involving an assemblage of five or more persons which by tumultuous and violent conduct creates grave danger of damage or injury to property or persons." N.D.C.C. § 12.1–25–01(2).

[¶ 46] Sparks testified she was 100 percent sure that Hidanovic participated in the fight and was armed with a baseball bat. The jury judged the credibility of the witnesses and weighed the evidence admitted at trial, and we do not reweigh that evidence. The jury found Hidanovic guilty of engaging in a riot when armed. Viewing the evidence and all reasonable inferences in the light most favorable to the jury's verdict, we conclude there was sufficient evidence to support the jury's verdict. We conclude the district court did not err in denying Hidanovic's motion for judgment of acquittal at trial, and the court did not abuse its discretion in denying his motion for a new trial on the ground of insufficiency of the evidence.

VII

[¶ 47] We affirm the judgment and the orders denying Hidanovic's motions for a new trial.

[¶ 48] GERALD W. VANDE WALLE, C.J., DANIEL J. CROTHERS, MARY MUEHLEN MARING, and CAROL RONNING KAPSNER, JJ. concur.