Filed 12/16/08 by Clerk of Supreme Court

IN THE SUPREME COURT

STATE OF NORTH DAKOTA

2008 ND 228

State of North Dakota, Plaintiff and Appellee

v.

Douglas Wayne Moos, Defendant and Appellant

Nos. 20080047 & 20080048

Appeal from the District Court of Stutsman County, Southeast Judicial District, the Honorable Mikal Simonson, Judge.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

Opinion of the Court by VandeWalle, Chief Justice.

Frederick Russell Fremgen, State’s Attorney, 511 2nd Avenue SE, Jamestown, N.D. 58401, for plaintiff and appellee.

Mark Taylor Blumer (argued) and Jessica Ahrendt (on brief), P.O. Box 475, Valley City, N.D. 58072, for defendant and appellant.

State v. Moos

Nos. 20080047 & 20080048

VandeWalle, Chief Justice.

[¶1] Douglas Moos appealed from a judgment of conviction finding him guilty of forgery or counterfeiting, deceptive writings, and theft by deception, and from an order dismissing his motion for a new trial.  We conclude Moos was improperly convicted and sentenced upon multiplicious counts, and we therefore reverse the judgment and remand with directions that the district court vacate some of the convictions.  In all other respects, the judgment and the order dismissing the motion for a new trial are affirmed.  

I

[¶2] The charges in these cases stem from lease transactions between RCT Services, Inc. (“RCT”) and Cen-Dak Leasing (“Cen-Dak”).  RCT was a trucking company whose sole officer was Charlene Spotts.  Moos was an employee of RCT, but the extent of his involvement in the company was disputed by the parties.  Moos claims he was merely a driver and mechanic for RCT.  The State claims he was integrally involved in the management of the company with Spotts.  To support its claim, the State presented evidence that Moos had opened RCT’s bank account and was the sole signatory on the account, and that Moos decided which equipment RCT would purchase and arranged the leases with Cen-Dak.

[¶3] Cen-Dak provided financing to trucking operators through lease-to-own transactions.  Operators would select equipment to purchase and negotiate the purchase with the seller.  Cen-Dak would then either provide payment directly to the seller of the equipment, or the operator could purchase the truck itself, provide the information to Cen-Dak, and Cen-Dak would send a check and lease directly to the operator, with title to the vehicle to be provided later.

[¶4] On March 23, 2001, a handwritten fax was sent from RCT to Cen-Dak indicating RCT had purchased a 2001 Peterbilt truck, giving the truck’s vehicle identification number (“VIN”) ending in “1605” and indicating a lease amount of $89,500.  In response to the fax, Cen-Dak prepared and sent to RCT a lease covering the truck and a check for $89,500.  Charlene Spotts signed the lease, and the check was deposited in RCT’s account.  The State presented evidence that the March 23, 2001, fax and the endorsement on the $89,500 check were in Moos’s handwriting. 

[¶5] Ordinarily RCT would have subsequently provided Cen-Dak a certificate of title or certificate of origin for the vehicle.  Instead, on July 26, 2001, a handwritten fax was sent from RCT to Cen-Dak indicating RCT had provided the wrong VIN for the 2001 Peterbilt, and providing a corrected VIN ending in “2566.”  The State again presented evidence that the fax was in Moos’s handwriting.  On September 4, 2001, a certificate of origin for the 2001 Peterbilt, showing a VIN ending in “2566,” was faxed from RCT to Cen-Dak.  At trial, the State established that neither RCT nor Moos had ever purchased or owned any interest in a 2001 Peterbilt with either of the listed VINs, and that the certificate of origin faxed to Cen-Dak was counterfeited.

[¶6] On May 25, 2001, a handwritten fax was sent from RCT to Cen-Dak indicating RCT had purchased a 2002 Peterbilt “glider kit,”
(footnote: 1) and noting that a copy of the invoice for the purchase was enclosed.  The fax was signed “Doug.”  Also faxed was a copy of an invoice from Peterbilt of Winona, indicating RCT had purchased the glider kit on May 24, 2001, for $68,250.  Based on these faxes, Cen-

Dak provided two checks, for $26,062 and $24,188, respectively, to RCT.  The State presented evidence that no such glider kit ever existed, that the invoice was counterfeited, and that the handwritten fax and endorsements on the two checks were in Moos’s handwriting.  

[¶7] In early 2004, the State charged Moos in two separate criminal informations.  In file number 04-K-105, the State charged Moos with forgery or counterfeiting under N.D.C.C. § 12.1-24-01(1), deceptive writings under N.D.C.C. § 12.1-24-03(1), and theft by deception under N.D.C.C. § 12.1-23-02(2).  All three counts were based upon the falsified glider kit invoice faxed to Cen-Dak on May 25, 2001.  The criminal information in file number 04-K-226 charged Moos with five separate counts: (1) deceptive writings under N.D.C.C. § 12.1-24-03(1) for the March 23, 2001, fax; (2) theft by deception under N.D.C.C. § 12.1-23-02(2) for the March 23, 2001, fax; (3) deceptive writings under N.D.C.C. § 12.1-24-03(1) for the July 26, 2001, fax; (4) forgery or counterfeiting under N.D.C.C. § 12.1-24-01(1) for the falsified certificate of origin faxed to Cen-Dak on September 4, 2001; and (5) theft by deception under N.D.C.C. § 12.1-23-02(2) for the July 26, 2001, fax and the September 4, 2001, falsified certificate of origin.

[¶8] Moos filed a “Motion and Brief to Elect and Dismiss on Grounds of Multiplicity,” arguing that the charges were multiplicious and that the State should be required to elect which charges to maintain.  The district court denied Moos’s motion.  The cases were consolidated for trial, and a jury trial was held in July 2005.  The jury found Moos guilty on all three counts in file number 04-K-105 and on the first three counts in file number 04-K-226.  The jury found Moos not guilty on counts four and five, the two counts dealing with the falsified certificate of origin, in file number 04-K-226.  

[¶9] Moos did not appear for the scheduled sentencing hearing on October 25, 2005, and a bench warrant was issued for his arrest.  On March 11, 2006, Moos was arrested for driving under the influence in Williston, but he resisted arrest and escaped from the arresting officer.  He was finally apprehended in West Fargo on June 8, 2007, after leading officers on a high speed vehicle chase, abandoning his vehicle after spinning into a ditch, and fleeing on foot.  Officers had to use a taser to apprehend and restrain Moos.  

[¶10] On October 29, 2007, Moos moved for a new trial based upon newly discovered evidence.  The new evidence was a recently disclosed transcript of an FBI agent’s interview of Dennis Paulsrud, the manager of Cen-Dak.  Paulsrud had testified at Moos’s July 2005 trial, and in August 2005 the State informed Moos’s attorney that Paulsrud had been indicted on federal charges for check-kiting and had committed suicide.  Moos argued that, had he been aware of the FBI interview and the federal investigation of Paulsrud, he could have more intensely cross-examined Paulsrud at trial and developed other evidence.  The district court ultimately dismissed Moos’s motion for new trial on the alternative grounds that it was precluded by the fugitive dismissal rule and that Moos had failed to show an exculpatory link between the interview transcript and the charges against Moos.  

[¶11] Moos was sentenced to serve five years on each of the six counts on which he was found guilty, to be served concurrently, followed by ten years of supervised probation.  Moos was also ordered to pay restitution in the amount of $169,923.

II

[¶12] Moos contends that the district court erred in concluding the informations were not multiplicious, and argues that his multiple convictions violated the double jeopardy clause.

[¶13] The constitutional guarantee against double jeopardy encompasses three separate protections: protection against a second prosecution for the same offense after acquittal, protection against a second prosecution for the same offense after conviction, and protection against multiple punishments for the same offense.  
Department of Revenue v. Kurth Ranch
, 511 U.S. 767, 769 n.1 (1994); 
North Carolina v. Pearce
, 395 U.S. 711, 717 (1969).  When the same conduct violates more than one statutory provision, the first step in the double jeopardy analysis is to determine whether the legislature intended that each violation be a separate offense.  
Garrett v. United States
, 471 U.S. 773, 778 (1985).  The “question whether punishments imposed by a court after a defendant’s conviction upon criminal charges are unconstitutionally multiple cannot be resolved without determining what punishments the Legislative Branch has authorized.”  
Whalen v. United States
, 445 U.S. 684, 688 (1980).  The question is ultimately one of legislative intent, and if the “legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the ‘same’ conduct under 
Blockburger [v. United States
, 284 U.S. 299 (1932)], a court’s task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial.”  
Missouri v. Hunter
, 459 U.S. 359, 368-69 (1983).  If, however, the legislature “intended that there be only one offense–that is, a defendant could be convicted under either statutory provision for a single act, but not both–there would be no statutory authorization for” multiple convictions or punishments “and that would end the double jeopardy analysis.”  
Garrett
, at 778.

[¶14] This focus upon legislative intent, and the recognition that “[c]ourts may not ‘prescrib[e] greater punishment than the legislature intended,’” 
Rutledge v. United States
, 517 U.S. 292, 297 (1996) (quoting 
Hunter
, 459 U.S. at 366), is an outgrowth of the constitutional separation of powers.  The power to define criminal offenses and prescribe punishments to be imposed for violations “resides wholly” within the legislative branch.  
Whalen
, 445 U.S. at 689; 
see
 
Hunter
, 459 U.S. at 368; 
State v. Backlund
, 2003 ND 184, ¶ 42, 672 N.W.2d 431; 
State v. Bastien
, 436 N.W.2d 229, 231 (N.D. 1989).  If a court exceeds its authority by “imposing multiple punishments not authorized by [the legislature], it violates not only the specific guarantee against double jeopardy, but also the constitutional principle of separation of powers in a manner that trenches particularly harshly on individual liberty.”  
Whalen
, at 689.

[¶15] Moos was convicted and sentenced on six separate criminal counts under three criminal statutes.  He was convicted of forgery or counterfeiting, deceptive writings, and theft by deception for the falsified glider kit invoice faxed to Cen-Dak on May 25, 2001; he was convicted of deceptive writings and theft by deception for the March 23, 2001, fax; and he was convicted of deceptive writings for the July 26, 2001, fax.  The three crimes are statutorily defined:

12.1-23-02.  Theft of property.
  A person is guilty of theft if he:

. . . .

2. Knowingly obtains the property of another by deception or by threat with intent to deprive the owner thereof, or intentionally deprives another of his property by deception or by threat . . . .

12.1-24-01.  Forgery or counterfeiting.

1. A person is guilty of forgery or counterfeiting if, with intent to deceive or harm the government or another person, or with knowledge that he is facilitating such deception or harm by another person, he:

a. Knowingly and falsely makes, completes, or alters any writing;  or

b. Knowingly utters or possesses a forged or counterfeited writing.

12.1-24-03.  Deceptive writings.

1. A person is guilty of an offense if, with intent to deceive or harm the government or another person, or with knowledge that he is facilitating such a deception or harm by another person, he knowingly issues a writing without authority to issue it or knowingly utters or possesses a deceptive writing.

[¶16] The State contends, and the district court concluded, that each of the statutes constitutes a different offense when analyzed under the “same elements” test formulated in 
Blockburger v. United States
, 284 U.S. 299 (1932).  Under 
Blockburger
, the court analyzes each offense to determine “whether each offense contains an element not contained in the other; if not, they are the ‘same offence’ and double jeopardy bars additional punishment and successive prosecution.”  
State v. Stensaker
, 2007 ND 6, ¶ 31, 725 N.W.2d 883 (quoting 
State v. Bertram
, 2006 ND 10, ¶ 14, 708 N.W.2d 913).  The 
Blockburger
 rule is premised upon the presumption that the legislature “ordinarily does not intend to punish the same offense under two different statutes,” and “[a]ccordingly, where two statutory provisions proscribe the ‘same offense,’ they are construed not to authorize cumulative punishments in the absence of a clear indication of contrary legislative intent.”  
Whalen
, 445 U.S. at 692; 
see
 
also
 
Rutledge
, 517 U.S. at 297.

[¶17] The United States Supreme Court has clarified, however, that the 
Blockburger
 rule is merely “a useful canon of statutory construction,” and it “is not controlling when the legislative intent is clear from the face of the statute or the legislative history.”  
Garrett
, 471 U.S. at 779; 
see
 
also
 
Hunter
, 459 U.S. at 367; 
Albernaz v. United States
, 450 U.S. 333, 340 (1981).  As the Court reasoned in 
Garrett
, at 779, “[i]nsofar as the question is one of legislative intent, the 
Blockburger
 presumption must of course yield to a plainly expressed contrary view on the part of” the  legislature.  Thus, if the legislative intent is clear from the language of the statute or its legislative history, 
Blockburger
 does not apply and the courts must enforce the clearly expressed intent of the legislative branch.

[¶18] All three of the criminal statutory provisions invoked by the State in this case were enacted in 1973 as part of the comprehensive revision of the criminal code.  
See
 1973 N.D. Sess. Laws ch. 116, §§ 22 and 23.  Each provision was an adoption of the corresponding provision from the proposed Federal Criminal Code.  The legislature’s intent is not clear from the face of the statutes.  
See
 
Garrett
, 471 U.S. at 779.  We therefore look to the official commentaries of the drafters, contained in the Working Papers of the National Commission on Reform of Federal Criminal Laws, to glean the legislative intent and purpose underlying our statutory provisions.  
See
 
State v. Schlotman
, 1998 ND 39, ¶ 11, 575 N.W.2d 208; 
State v. Rambousek
, 479 N.W.2d 832, 834-35 (N.D. 1992). 

[¶19] The drafters of the proposed Federal Criminal Code recognized the great degree of overlap among the related offenses of theft by deception, forgery or counterfeiting, and deceptive writings.  The Working Papers clarify that the drafters intentionally included such overlap, but expressed a clear intent that prohibitions against multiple charging and punishments would ensure that an offender would suffer but one punishment for a single act which violated more than one of these provisions.  For example, addressing the overlap between theft by deception and forgery or counterfeiting, the drafters noted:

A second point that needs to be noticed is that it is necessary in determining which offenses to include within a separate concept of forgery to pay some attention to the previously defined offense of theft proposed for the new Code.  It would be possible to take the position that the false making of documents is normally but one step in an attempt to obtain property by deception.  A prosecution for theft by deception (which includes attempts) would thus be possible in many instances where a separate forgery prosecution might also be possible. . . . . 

Beyond such offenses where there is a clearly identifiable purpose in retaining separate crimes, however, there are many cases where it is simply redundant to include a separate superstructure of forgery and theft offenses.  If no grading distinctions are sought to be made, in other words, and if the substantive reach is substantially the same, it adds to the complexity of the law with no countervailing rewards to have two offenses–attempted theft by deception and falsely making a document for the purpose of deceiving or injuring another–where one would do the job.  Nevertheless, there is a strong tradition supporting separate offenses, and most recent reform efforts have succumbed to that tradition.  

The provisions that are submitted here have been drafted on the premise that such redundancy is not a major concern in this area of the law.  To the extent that this premise should be retreated from, the concepts of “false making,” “writing,” and the like should be narrowed.  They have been broadly drafted in the submission in the belief that the Commission is likely to want to maintain some large degree of overlap between these two offenses both to insure coverage and for the separate reason that careful delineation of the distinct areas where forgery and counterfeiting offenses are not redundant might lead to the introduction of technical distinctions of the sort that have been sought to be avoided in the theft draft as well as elsewhere in the new Code.  With proper limitations on multiple charging and consecutive sentencing and with attention to the problem of consolidating offenses for indictment purposes, the question becomes more one of arrangement than of substance.  In this posture, it is probably better to continue the tradition of separate treatment.  

II Working Papers of the National Commission on Reform of Federal Criminal Laws 961-62 (July 1970) (“Working Papers”).  Similarly, the Working Papers address the overlap between theft by deception and deceptive writings:

(d) Overlap with theft.–The main question put by including the issuance of writings without authority and the use of deceptive writings along with other uttering and possession offenses is whether an undesirable overlap with already drafted theft offenses is created.  Although the present United State Code contains a number of separate offenses which address conduct of this type distinctly from either theft or forgery, a case could be made that the present Code is redundant, and that the redundancy should not be continued here.  It is unlikely that uttering a deceptive document cannot be reached as an attempt to obtain property by deception.  The extent to which it cannot be may well turn on the extent to which “intent to deceive or harm” will be applied in contexts where obtaining property is not the objective of the actor.  These are not statistically important uses of an uttering statute, however, and to the extent that appropriation of property is the object of conduct covered by these sections, a substantial degree of overlap between these provisions and the provisions included in the theft materials does in fact exist.

The question, then, comes down to a judgment about the extent of such overlap that should be included.  As pointed out in several places above, there will necessarily be a high degree of overlap between forgery and theft offenses in general, and the attempt to eliminate it completely may well introduce more technicalities than its retention.  Moreover, the proper approach to such overlap would seem to be through limitations on multiple charging and consecutive sentencing.

II Working Papers, at 970-71.

[¶20] The legislative history also clarifies that forgery or counterfeiting and deceptive writings, while constituting separate offenses, are intended to reach misuse of different classes of documents and therefore, by definition, an actor could not be guilty of both offenses through use of the same document.  The official Comment to Section 1753 of the proposed Federal Criminal Code, governing deceptive writings, addresses the distinctions in the types of documents covered by each offense and concludes:

However, although there may be no difference in culpability between use of a forged writing and use of a deceptive writing, and thus no difference in the grading of the two kinds of misconduct, the offense defined here is separated from forgery, because the latter has traditionally dealt only with instruments which themselves are defective.

Final Report of the National Commission on Reform of Federal Criminal Laws 227, Comment to § 1753 (1971); 
see
 
also
 II Working Papers, at 970; A Hornbook to the North Dakota Criminal Code, 50 N.D.L.Rev. 639, 728 (1974).

[¶21] The legislative history of these various criminal provisions clearly indicates an intent to prohibit multiple convictions and punishments for a single act.  Throughout the discussions in the Working Papers the drafters repeatedly express the idea that each of these offenses reaches an equally culpable level of criminal conduct, and that each offense should carry an equal degree of punishment, irrespective of which single offense is charged.  The drafters clearly expressed their belief that any overlap among the statutory offenses should be ameliorated by strict limitations on multiple charging and punishments.  Accordingly, we conclude that the legislative history expresses the legislature’s intent that multiple convictions and punishments are not permitted for the same conduct under the theft by deception, forgery or counterfeiting, and deceptive writings statutes.

[¶22] In this case, Moos was subjected to multiple convictions and punishments for the falsified invoice faxed to Cen-Dak on May 25, 2001, and for the March 23, 2001, fax to Cen-Dak.  Although Moos was sentenced to identical concurrent five-year terms on each of his six convictions, we must remand to the district court for vacation of the multiple convictions which violate double jeopardy.  The appropriate remedy is outlined in 
Rutledge
, 517 U.S. at 301-02:

[I]n 
Ball v. United States
, 470 U.S. 856 (1985)[,] . . . we concluded that Congress did not intend to allow punishment for both illegally “receiving” and illegally “possessing” a firearm.  
Id.
, at 861-864.  In light of that conclusion, we held that “the only remedy consistent with the congressional intent is for the District Court . . . to exercise its discretion to vacate one of the underlying convictions” as well as the concurrent sentence based upon it.  
Id.
, at 864.  We explained further:

“The second conviction, whose concomitant sentence is served concurrently, does not evaporate simply because of the concurrence of the sentence.  The separate 
conviction
, apart from the concurrent sentence, has potential adverse collateral consequences that may not be ignored.  For example, the presence of two convictions on the record may delay the defendant’s eligibility for parole or result in an increased sentence under a recidivist statute for a future offense.  Moreover, the second conviction may be used to impeach the defendant’s credibility and certainly carries the societal stigma accompanying any criminal conviction.  See 
Benton v. Maryland
, 395 U.S. 784, 790-791 (1969); 
Sibron v. New York
, 392 U.S. 40, 54-56 (1968).  Thus, the second conviction, even if it results in no greater sentence, is an impermissible punishment.”  
Id.
 at 864-

865.

Under 
Ball
, the collateral consequences of a second conviction make it as presumptively impermissible to impose as it would be to impose any other unauthorized cumulative sentence.

Accordingly, we remand to the district court with directions that the court vacate two of the convictions and sentences imposed for the May 25, 2001, falsified invoice and vacate one of the convictions and sentences imposed for the March 23, 2001, fax.

III

[¶23] Moos contends that the State engaged in prosecutorial misconduct resulting in denial of a fair trial, arguing that “[t]he prosecutor improperly commented, through questioning of a witness, on Moos’s post-arrest and post-
Miranda
 silence.”

[¶24] The defense called only one witness at trial, the investigating officer from the Jamestown Police Department, Gary Peterson.  In Peterson’s brief testimony, the defense established that Peterson had not located RCT’s computers and did not take a statement from Charlene Spotts.  On cross-examination, the State questioned whether Peterson had attempted to interview both Moos and Spotts: 

Q. (BY MR. FREMGEN) Captain Peterson, did you want to interview the defendant, Mr. Moos?

MR. TERRY: Your Honor, I’m going to object, outside the scope.

THE COURT: Overruled.

Q. (BY MR. FREMGEN) Did you want to interview in your investigation the defendant in this case, Mr. Moos?

A. No, I did not.

Q.   No.  Did you want to, not did you?

A. No.  I tried but I did not interview Mr. Moos.

Q. So you wanted to interview Mr. Moos and take his statement, did you not?

A.   Yes.

Q And what–How did you try to accomplish that?

A. Through a phone call through his business, and I also tried to notify and speak with a Charlene Spotts.

Q. And Ms. Spotts also was noncompliant with a request for an interview?

A. Yes.

Q. So neither one would respond to your request for interviews; is that correct?

A. That’s correct, yes.

Q. So you were never able to take a statement from either one of them?

A. No, sir.

[¶25] Moos relies upon the United States Supreme Court’s pronouncement against use of a defendant’s post-
Miranda
 silence for impeachment at trial, quoting 
Doyle v. Ohio
, 426 U.S. 610, 619 (1976) (quoting 
United States v. Hale
, 422 U.S. 171, 182-

83 (1975) (White, J., concurring)):

“[W]hen a person under arrest is informed, as 
Miranda
 requires, that he may remain silent, that anything he says may be used against him, and that he may have an attorney if he wishes, it seems to me that it does not comport with due process to permit the prosecution during the trial to call attention to his silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony.”

See
 
also
 
City of Williston v. Hegstad
, 1997 ND 56, ¶ 9, 562 N.W.2d 91.  The Supreme Court has clarified, however, that 
Doyle
 applies only to a defendant’s post-

arrest, post-
Miranda
 silence:

In this case, no governmental action induced petitioner to remain silent before arrest.  The failure to speak occurred before the petitioner was taken into custody and given 
Miranda
 warnings.  Consequently, the fundamental unfairness present in 
Doyle
 is not present in this case.  We hold that impeachment by use of prearrest silence does not violate the Fourteenth Amendment.

Jenkins v. Anderson
, 447 U.S. 231, 240 (1980); 
see
 
also
 
Hegstad
, at ¶ 9.

[¶26] The record in this case is entirely silent upon whether Peterson’s attempt to contact and interview Moos occurred before or after he was arrested and advised of his right to remain silent.  Moos acknowledges that the record contains no evidence about the timing of Peterson’s investigation, but claims that “the inference can be drawn from the record that because Peterson was investigating Moos, he had been given his 
Miranda
 rights.”  There simply is no basis for drawing such a blind inference in this case.  It is equally as likely that Peterson was engaged in a preliminary stage of the investigation, before an arrest had been made, when he attempted to contact Moos for an interview.  Peterson was Moos’s witness, and Moos could have elicited testimony about the relevant time frame and context of Peterson’s attempt to interview Moos.  We cannot resolve a constitutional issue based upon a pure guess about the relevant facts.

[¶27] Moos’s arguments on this issue are based entirely upon his assertion that the prosecution elicited comments on post-arrest, post-
Miranda
 silence.  Moos does not argue that a violation occurred if the attempt to interview Moos occurred before he was arrested and advised of his right to remain silent.  On this record, Moos has failed to demonstrate a constitutional violation.

IV

[¶28] Moos argues that the district court abused its discretion when it ordered him to pay restitution.  

[¶29] The district court ordered Moos to pay restitution in the amount of $169,923, with no payments due during his incarceration.  Moos was ordered to pay $500 per month commencing 90 days after his release from prison, continuing for the duration of his ten years of probation.  At the end of his probation, the balance would be due as a lump sum.  Moos contends this restitution order was an abuse of discretion because he will not have the ability to pay the amounts as ordered.

[¶30] A sentencing court has the authority to order a criminal defendant to pay restitution.  N.D.C.C. § 12.1-32-08(1); 
State v. Tupa
, 2005 ND 25, ¶ 3, 691 N.W.2d 579.  This Court must affirm the restitution order of the district court unless the court acted outside the limits set by statute, which is similar to an abuse-of-discretion standard.  
State v. Gendron
, 2008 ND 70, ¶ 7, 747 N.W.2d 125; 
Tupa
, at ¶ 3.  A district court abuses its discretion if it acts in an arbitrary, unreasonable, or unconscionable manner, if its decision is not the product of a rational mental process leading to a reasoned determination, or if it misinterprets or misapplies the law.  
Gendron
, at ¶ 7; 
Tupa
, at ¶ 3.  Although the State has the burden of proving the amount of restitution, the defendant has the burden to raise and prove an inability to pay the restitution ordered.  
Gendron
, at ¶ 8; 
Tupa
, at ¶ 3; 
State v. Gill
, 2004 ND 137, ¶ 14, 681 N.W.2d 832.

[¶31] The district court has a wide degree of discretion when determining the appropriate amount of restitution.  
Gendron
, 2008 ND 70, ¶ 8, 747 N.W.2d 125.  We have reviewed the record in this case and find no abuse of discretion in the court’s restitution order.  

V

[¶32] Moos contends the district court abused its discretion in denying his motion for a new trial based upon newly discovered evidence.

[¶33] The basis for Moos’s motion for a new trial was his discovery of an FBI interview of Dennis Paulsrud, the manager of Cen-Dak.  Moos had been previously provided with portions of the transcript of this interview which were conducted by Gary Peterson of the Jamestown Police Department.  He did not, however, receive portions of the interview which were conducted by an FBI agent and which related to a pending federal investigation of Paulsrud for check-kiting.

[¶34] We recently outlined the applicable standards when a criminal defendant moves for a new trial based upon newly discovered evidence.

To prevail on a motion for a new trial on the ground of newly discovered evidence, the defendant must show (1) the evidence was discovered after trial, (2) the failure to learn about the evidence at the time of trial was not the result of the defendant’s lack of diligence, (3) the newly discovered evidence is material to the issues at trial, and (4) the weight and quality of the newly discovered evidence would likely result in an acquittal.  A motion for new trial based upon newly discovered evidence rests within the discretion of the trial court, and we will not reverse the court’s denial of the motion unless the court has abused its discretion.  If the newly discovered evidence is of such a nature that it is not likely to be believed by the jury or to change the results of the original trial, the court’s denial of the new trial motion is not an abuse of discretion.

State v. Hidanovic
, 2008 ND 66, ¶ 30, 747 N.W.2d 463 (quoting 
State v. Driscoll
, 2005 ND 105, ¶ 23, 697 N.W.2d 351).

[¶35] A new trial will be granted only if the new evidence is of such a nature that it would probably produce an acquittal upon retrial.  
Clark v. State
, 1999 ND 78, ¶ 30, 593 N.W.2d 329; 
Hopfauf v. State
, 1998 ND 30, ¶ 5, 575 N.W.2d 646, 
overruled on other grounds by
 
Whiteman v. State
, 2002 ND 77, ¶ 17, 643 N.W.2d 704.  New evidence which merely serves to impeach a witness does not generally provide a sufficient basis to grant a new trial.  
State v. Steinbach
, 1998 ND 18, ¶ 23, 575 N.W.2d 193.  We review a district court’s denial of a motion for new trial under the abuse of discretion standard.  
State v. Fehl-Haber
, 2007 ND 99, ¶ 20, 734 N.W.2d 770. 

[¶36] In his motion for a new trial, Moos did not establish a link between the charges against him and any alleged wrongdoing by Paulsrud.  In his brief in support of the motion, Moos argued that he could have more intensely cross-examined Paulsrud and Peterson and possibly could have subpoenaed other individuals named during Paulsrud’s interview.  Mere impeachment evidence is not sufficient, however, to support a motion for a new trial, 
see
 
Steinbach
, 1998 ND 18, ¶ 23, 575 N.W.2d 193, and Moos does not otherwise demonstrate how the evidence of Paulsrud’s alleged misconduct detailed in the interview transcript exculpates Moos on the charges in this case.  Even if Paulsrud was engaged in check-kiting to keep Cen-Dak in business, that does not explain away the deceptive faxes in Moos’s handwriting sent from RCT to Cen-Dak, nor his endorsement of checks from Cen-Dak for leases on nonexistent collateral.  Under the  circumstances in this case, we conclude the district court did not abuse its discretion in determining that the new evidence presented by Moos was not exculpatory and in denying the motion for a new trial.

VI

[¶37] We have considered the remaining issues and arguments raised by the parties and find them to be either unnecessary to our decision or without merit.  We reverse the judgment and remand to the district court with directions that the court vacate two of the convictions and sentences imposed for the May 25, 2001, falsified invoice and vacate one of the convictions and sentences imposed for the March 23, 2001, fax.  In all other respects, the judgment and the order dismissing the motion for new trial are affirmed.

[¶38] Gerald W. VandeWalle, C.J.

Dale V. Sandstrom

Daniel J. Crothers

Mary Muehlen Maring

Carol Ronning Kapsner

FOOTNOTES
1:    
A “glider kit” is a truck body and frame without the engine or drive train.